## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Case No. 25-cv-01042 (JEB)

K. L. SMITH,

         Plaintiff,

v.

PETE R. FLORES, in his official capacity
    as Acting Commissioner for U.S. Customs
    and Border Protection,
DONALD JOHN TRUMP,
ELON REEVE MUSK,
J.D. VANCE,
JAMES MICHAEL JOHNSON,
JOHN G. ROBERTS, JR.,
BRETT M. KAVANAUGH,
NEIL M. GORSUCH,
AMY CONEY BARRETT,
SAMUEL A. ALITO, JR.,
CLARENCE THOMAS, and
DOES 1-500,

         Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Comes now the Plaintiff, *in propria persona*, stating the following in support of this Complaint and Jury Demand:

### INTRODUCTION

***When the economy crashes**, when the country goes to total hell, and everything is a disaster, then you'll have a—**you know, you'll have riots**—to go back to where we used to be when we were great.*

Donald J. Trump, Interview, *Fox News*, Feb. 3, 2014 (removed by Fox), excerpt preserved at https://x.com/TrumpFile/status/1808515811495023014 ([posted Jul. 3, 2024) (emphasis added). On the face of it, using economic isolationism and a radical tariff regime, Russia's Agent Donaldov appears to be initiating the Second Great Depression.



**RECEIVED**

JUN 21 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia



We the people are the rightful masters of both Congress and the courts, not to overthrow the Constitution but to **overthrow the men** who **pervert the Constitution.**

– *Abraham Lincoln*

AZ QUOTES

The Fourteenth Amendment to our Constitution is pellucid: An adjudged insurrectionist may not serve as our President until and unless Congress, "by a vote of two-thirds of each House, remove[s] such disability." *U.S. Const. amend. XIV*, § 3.

By definition, the Constitution is a self-executing document. *Marbury v. Madison,* 5 U.S. 137, 177 (1803).[1] Moreover, the framers of the Fourteenth Amendment treated it as a self-executing document, as evidenced by their treatment of Nathan Tift.[2] No one had to prove in court that Tift was a captain in the Confederate Navy or convict him of insurrection. He had previously taken an oath in his capacity as a Georgia state legislator "to support the Constitution of the United States [and] engaged in insurrection or rebellion against the same." U.S. Const. amend. XIV, § 3. He was ineligible to serve, and unless Congress removed that disability "by a vote of two-thirds of each House," id., he could not serve as an elected official of the federal government. Full stop.

Defendant Donald Trump had previously taken an oath as President "to support the Constitution of the United States," and was found by a competent court by clear and convincing evidence that he had engaged in insurrection, as that term is used in Section Three. *Anderson v. Griswold*, No. 23CV32577, ¶¶241, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023). Thus, as a matter of law and in accordance with established precedent, Trump cannot serve as our President unless and until Congress affirmatively removes that disability.

---

[1] There is no support in precedent or logic for the proposition that a constitutional provision must be activated by formal legislation to become effective. *E.g., United States v. Stanley (Civil Rights Cases),* 109 U.S. 3, 20 (1883) ("the Thirteenth amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation"), *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) (Fourteenth); *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (Fifteenth); *see, Jacobs v. United States*, 290 U.S. 13, 16 (1933) (Fifth Amdt. takings clause is an implied waiver of sovereign immunity); *cf., Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. 243 (1833) (Bill of Rights originally not enforceable as against the States—by design).

[2] Upon the readmission of Georgia to representation, Tift was elected as a Democrat to the Fortieth Congress. The Fourteenth Amendment was ratified on July 9, 1868—presumably, while Tift was *en route*. But rather than remove Tift's disability, Congress passed a private bill **enabling him to serve out that Term—but no more**. "Congress enacted a private bill to remove the Section 3 disability of Nelson Tift of Georgia, who had recently been elected to represent the State in Congress. See ch. 393, 15 Stat. 427. Tift took his seat in Congress immediately thereafter. See Cong. Globe, 40th Cong., 2d Sess., 4499-4500 (1868)." *Trump v. Anderson*, 601 U.S. 100, ___, 144 S. Ct. 662, 669 & n.2. But Georgia sent six secessionists to the Forty-First Congress which the members refused to seat, including Nathan Tift. Biographical Directory: Forty-First Congress at 179 & fn. 11, https://www.govinfo.gov/content/pkg/GPO-CDOC-108hdoc222/pdf/GPO-CDOC-108hdoc222-3-41.pdf.

The Constitution is a stern mistress, brooking no infidelity. Writing for the Court, Defendant Roberts admitted that "Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them." *Nat. Fedn. of Indep. Business v. Sebelius*, 567 U.S. 519, 132 S.Ct. 2566, 2579 (2012).[3]



But on that fateful March day that Defendant Trump "won't forget," the Conspiring Justices[4] embarked on a life of crime, doing The Don a solid by committing a felony in order to help keep him out of prison.  18 U.S.C. § 3.  **"Thank you again," indeed.**

---

[3] The Constitution entrusted our federal judiciary with the judicial Power: the authority to apply the law of the land to the facts of every case brought before them.  **It is not power to rewrite the Constitution.**  "Courts are constituted by authority and they can not go beyond the power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities." *Vallely v. Northern Fire & Marine Ins. Co.,* 254 U.S. 348, 353 (1920).

For five centuries, it has been universally understood that the office of the judge "is *jus dicere*, and not *jus dare*; to interpret law, and not to make law, or give law." Francis Bacon, *Essays* LVI (Of Judicature) (1620). Lord Coke maintained that "[i]t is the function of a judge not to make, but to declare the law, according to the golden mete-wand of the law and not by the crooked cord of discretion." 1 E. Coke, Institutes of the Laws of England 51 (1642). Blackstone adds that a judge is "sworn to determine, not according to his own judgments, but according to the known laws." 1 Wm. Blackstone, *Commentaries on the Laws of England* *69 (1765).

Under our system, the judicial power is "to decide what the law is, not to declare what it should be," *Minor v. Happersett*, 88 U.S. 162, 178 (1874), for as long as judges are at liberty to "substitute their own pleasure to the constitutional intentions of the legislature," *The Federalist* No. 78, 440 (I. Kramnick ed. 1987) (Alexander Hamilton)—or the people—it can no longer honestly be said that we are a nation governed by laws.  **There is no contrary authority.**

The rewriting of the Constitution under a false pretense of interpreting it is "a flagrant perversion of the judicial power." *Heiner v. Donnan*, 285 U.S. 312, 331 (1932).  In the timeless words of Justice Holmes, it is 'an unconstitutional assumption of powers by courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938).  **There is no contrary authority.**

[4] The "Conspiring Justices" are Chief Justice John G. Roberts, Jr. and Justices Clarence Thomas, Samuel A. Alito, Neil M. Gorsuch, Brett M. Kavanaugh, and Amy Coney Barrett.

As Defendant Donald Trump cannot be President by definition, everything he has done is void as a matter of law. And as the Conspiring Justices have violated the only condition on their sinecures—the condition of good behavior, U.S. Const. art. III, § 1—they may be removed from the bench forthwith.

On information and belief, Defendant J.D. Vance was installed as Trump's vice-presidential candidate by Defendant Elon Reeve Musk, Peter Thiel, and others, and was a knowing party to the criminal agreement Defendant Trump thanked Defendant Roberts for participating in and at least, bears criminal liability for a misprision.

On information and belief, the Defendants (with the exception of Mr. Flores, sued here in his official capacity only) are knowing participants in a scheme to loot and overthrow the United States government. Central to this scheme is an attempt to crash the economy and invoke martial law, thereby stifling dissent. While the list of federal crimes this would involve is as long as one's arm, the F.B.I., Department of Defense, and Department of Justice are under control of potential co-conspirators, and criminal prosecution through ordinary means is next-to-impossible.[5] The only way they can be stopped is through a civil action.

## PARTIES

1. Plaintiff K. L. SMITH is and has been an American citizen for all times pertinent to this action, who been personally and directly injured by Defendants' tortious actions.

2. On information and belief, Defendant PETE R. FLORES is the Acting Commissioner for U.S. Customs and Border Protection, sued here in his official capacity only.

3. DONALD JOHN TRUMP is a former President of the United States, illegally occupying the White House in open and notorious violation of the Constitution. He is responsible for actions and decisions challenged by Plaintiff in this action.

4. ELON REEVE MUSK is, on information and belief, the de facto President of the United States, illegally arrogating public powers outside of law and beyond reason. He is responsible for actions and decisions challenged by Plaintiff in this action.

5. J.D. VANCE is nominally the sitting Vice-President of the United States, who is, on information and belief, a knowing participant in the conspiracies alleged in this action.

---

[5] Devlin Barrett, Bondi Suggests Signal Chat Episode Is Unlikely to Be Criminally Investigated, *N.Y. Times*, March 27, 2025 (cover-up of the worst security breach since Benedict Arnold).

6. Defendant JAMES MICHAEL JOHNSON a/k/a "MIKE" JOHNSON is the current Speaker of the United States House of Representatives, who has actively participated in the conspiracies alleged herein.

7. Defendants JOHN G. ROBERTS, JR., BRETT M. KAVANAUGH, NEIL M. GOR-SUCH, AMY CONEY BARRETT, SAMUEL A. ALITO, JR., and CLARENCE THOMAS are sitting Justices on the United States Supreme Court, sued in both their official and indi-vidual capacities. They are referred to collectively herein as "the Conspiring Justices," re-sponsible for actions and decisions challenged by Plaintiff in this action.

8. DOES 1-500 are, on information and belief, knowing participants in the conspiracies alleged in this complaint, to be identified pursuant to discovery.

## JURISDICTION AND VENUE

9. Jurisdiction is conferred by 28 U.S.C. § 1331.

10. Venue is proper as, on information and belief, a significant portion of the actions pertinent to this matter either have occurred or will occur within this District.

## ALLEGATIONS OF FACT

A. Voltaire: "*Il Est Dangereux D'avoir Raison….*"

America has never tasted the jackboot of fascism, but Defendant Trump is bring-ing it to our door at a level "like nobody's ever seen before." To take root, Fascism requires ignorance and fear. The autocrats' ultimate goal is to control the infor-mation space by stifling dissent. Opposition leaders are targeted, and the judiciary is stripped of its independence. *See e.g.,* Lydia Gall, Hungary's Latest Assault on the Judiciary, *Human Rights Watch*, Dec. 14, 2018. Journalists become targets early on because authoritarians know that controlling information is key to maintaining power. Ruth Ben-Ghiat, *Strongmen: Mussolini to the Present* (Norton: 2020). As Trump's war on the information space from the White House is violative of the Constitution, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Coun-cil*, 425 U.S. 748 (1976), and Plaintiff is currently being harmed by the Defendants' actions, Plaintiff has standing to proceed.

"Trump, 78, has declared 'We are the federal law' and posted a social media image of himself wearing a crown with the words 'Long live the king'. He also channeled Napoleon with the words: "He who saves his country does not violate any law." And JD Vance has stated that "judges aren't allowed to control the executive's legitimate power." David Smith, The Trump administration is descending into authoritarianism, *The Guardian*, Mar. 22, 2025. This is a war long planned, with tactics unleashed like a firehose from the authoritarian rulebook:

- evisceration of the federal government;
- delegitimization of judges and defying their orders;
- deporting immigrants without due process;
- cowing journalists and news outlets by intimidation;
- flooding the information space with a fusillade of falsehoods;
- retributive acts against opponents and their law firms, and
- crashing the economy.

11.   Plaintiff is, and has been for all times pertinent to this action, a subscriber to the *Washington Post*.

12.   On information and belief, the *Washington Post* is one of the two de facto "papers of record" in America, traditionally serving as a reliable first draft of history.

13.   On information and belief, the *Washington Post* is owned by centi-billionaire Jeff Bezos. Benjamin Mullin and Katie Robertson, A Decade Ago, Jeff Bezos Bought a Newspaper. Now He's Paying Attention to It Again, *N.Y. Times,* Jul. 23, 2023.

14.   On information and belief, Bezos is the largest shareholder of e-commerce megalith Amazon, and those holdings comprise a large portion of his wealth. Notice of 2024 Annual Meeting of Shareholders & Proxy Statement, *Amazon, Inc.,* May 22, 2024, at 84.

15.   On information and belief, Amazon's business model relies heavily on having favorable contracts with the U.S. Postal Service, which were beneficial to both parties. *E.g.,* Todd Bishop, Internal documents say U.S. Postal Service made $1.6B profit on Amazon deliveries in FY2019, *GeekWire*, Sept. 17, 2020, https://www.geekwire.com/2020/internal-documents-say-u-s-postal-service-made-1-6b-profit-amazon-fy2019/,

16.  On information and belief, during his term as our President, Defendant Trump "called on the USPS to raise the price of delivering packages for Amazon," *id.,* for the ostensible purpose of browbeating Bezos into providing more favorable press coverage.

17.  On information and belief, Bezos, as owner of the *Washington Post*, has the inherent power to dictate its coverage of Defendant Trump.

18.  On information and belief, while a candidate for President in 2016, Defendant Trump barred the *Washington Post* from his rallies in retaliation for unfavorable coverage. Nolan D. McCaskill and Joe Pompeo, Trump: I'm revoking 'dishonest' Washington Post's credentials, *Politico,* Jun. 13, 2016.

19.  On or about September 26, 2023, the Federal Trade Commission ("FTC") and 17 state attorneys general "sued Amazon.com, Inc. alleging that the online retail and technology company is a monopolist that uses a set of interlocking anticompetitive and unfair strategies to illegally maintain its monopoly power."  FTC Sues Amazon for Illegally Maintaining Monopoly Power (press release), *Federal Trade Commission*, Sept. 26, 2023.

20.  On information and belief, Bezos paid the astronomical sum of $40,000,000 for the rights to the life story of Melania Knauss Trump, Poulami Sengupta, CNN guest Scott Galloway slams Jeff Bezos for agreeing to pay $40M for Melania Trump documentary rights, *News.Meaww*, Feb 26, 2025, (video: https://news.meaww.com/cnn-guest-scott-galloway-slams-jeff-bezos-for-agreeing-to-pay-40-m-for-melania-trump-documentary-rights), which is many times the true fair market value (Defendant Elon Musk's AI alter ego Grok estimated its fair value at $5-10 million).

21.  On information and belief, Amazon paid $1,000,000 to the Trump Inaugural Fund and gave another $1 million in-kind donation by streaming the 2025 inauguration ceremony

on Amazon Video. Kaitlan Collins, et al., Amazon plans to donate $1 million to President-elect Donald Trump's inauguration, *CNN,* Dec. 12, 2024.

22.  On information and belief, Amazon has only now chosen to stream *The Apprentice* (the TV show starring Defendant Trump), Anna Kaufman, Donald Trump's reality show 'The Apprentice' arrives for streaming: How to watch, *USA Today*, Mar. 10, 2025, despite having acquired the rights to it back in 2021.  Dominick Reuter and Jack Newsham, Amazon could own unaired Trump 'Apprentice' tapes after buying MGM, but it probably still can't release them, *Business Insider*, May 26, 2021.

23.  On information and belief, Defendant Trump receives 50% of all royalty income earned when *The Apprentice* is aired. Adam Epstein, "The Apprentice" may have (temporarily) saved Trump from financial ruin, *Quartz*, Sept. 28, 2020.

24. In 2024, the *Washington Post* refused to endorse a candidate for President. David Folkenflik, 'Washington Post' won't endorse in White House race for first time since 1980s, *NPR*, Oct. 25, 2024.

25.  On information and belief, the refusal to endorse was not a principled decision, but one of genuflection toward Defendant Trump. David Bauder, Newspaper non-endorsements at Washington Post, LA Times fit a trend, but their readers aren't happy, *AP*, Oct. 29, 2024; Several editorial board members resigned, and "Washington Post legends Bob Woodward and Carl Bernstein issued a statement saying: 'We respect the traditional independence of the editorial page, but this decision 12 days out from the 2024 presidential election ignores the Washington Post's own overwhelming reportorial evidence on the threat Donald Trump poses to democracy.'" Manuel Roig-Franzia and Laura Wagner, The Washington Post says it will not endorse a candidate for president, *Wash. Post*, Oct. 25, 2024.

26.  Observing that "it is asking a lot of readers not to suspect that Bezos's personal business interests play no role" in his editorial changes, veteran columnist Ruth Marcus recently resigned from the Post. Ruth Marcus, Why I Left the Washington Post, *The New Yorker*, March 12, 2025.

27.  On information and belief, Bezos is currently in the process of decapitating the Washington Post reporting staff, replacing them with right-wing ideologues.  Erkki Forster, The Washington Post Looks to Recruit Right-Wing Journalists, *The Daily Beast*, Mar. 5, 2025;

28.  On information and belief, Bezos' payments to the Trump family and editorial shift constitute a disguised bribe to secure favorable USPS access and shield Amazon from antitrust enforcement under the Trump Administration.[6]

29.  On information and belief, the relationship between Bezos' financial dealings with Defendant Trump and editorial shifts at the *Washington Post* cannot be seen as coincidental but instead, reflects his self-censorship of the Post under implicit coercion, fearing Trump's retaliation if he does not comply.

30.  On information and belief, Bezos' behavior mirrors that of journalists and media outlets in authoritarian regimes, where leaders use legal threats, financial ruin, or physical harm

---

[6] Grok summarizes the new *Apprentice* airing thusly: "In short, Amazon hasn't 'bought' the rights anew in 2025; it leverages its existing MGM ownership to stream *The Apprentice*, reinforcing its strategic ties with the Trump family as of March 27, 2025," describing "Amazon's pattern of Trump-related investments." Grok 3, Mar. 28, 2025 (Query: "Has Amazon bought the rights to The Apprentice?"; screenshots retained). Musk describes Grok 3 as "the smartest AI on earth," Matt High, Why Elon Musk Claims Grok-3 is the World's 'Smartest AI', *AI Magazine*, Feb. 19, 2025, and Plaintiff need not quibble here.

   Amazon's antitrust exposure could have a seismic effect on its market value.  Defendant Trump is known to have had a long-standing relationship with DeutscheBank; while New York and U.K. regulators slapped the bank with a combined $630 million fine for Russian money laundering, Jethro Mullen, Deutsche Bank fined for $10 billion Russian money-laundering scheme, CNN Business, Jan. 31, 2017, federal regulators under Trump made a similar probe 'go away'; "The DOJ investigation has been closely watched by Democrats on Capitol Hill who have tried and failed to get Deutsche Bank to turn over its internal investigation into the Russian trades and a separate internal review into whether bank accounts of President Donald Trump and his family have any ties to Russia." Kara Scannell, DOJ Probe on Russian Trades Through Deutsche Bank Quiet, *CNN Politics*, Nov. 15, 2017.  *Russia, Russia, Russia*!  **Guess it *pays* to know the Boss.**

to induce self-censorship: "The strongman's media strategy often relies on intimidation rather than outright bans, encouraging self-censorship among journalists and outlets eager to survive." Ruth Ben-Ghiat, *Strongmen* at 112.

32.   Plaintiff has a legally cognizable interest in receiving news from independent sources uncensored by the heavy hand of government, as access to such information is an essential predicate to the citizen's effective participation in the affairs of a democratic republic. *Virginia St. Board of Pharmacy, supra.*

33.   That the federal government is now legally permitted to disseminate domestic propaganda, Smith-Mundt Modernization Act of 2012, Pub. L. No. 112-239, § 1078, 126 Stat. 1632, 1957–58 (2013) (codified at 22 U.S.C. § 1461 (2025)), makes the First Amendment's protection of the Fourth Estate from governmental coercion even more imperative.

34.   On information and belief, the shakedown of Jeff Bezos is an integral part of Defendant Trump's larger war against the media, emblematic of authoritarian regimes.

35.   Defendant Trump has filed an array of giggleworthy lawsuits against media defendants, exemplified by *Trump v. Selzer*, No. 4:24-cv-00449 (S.D. Iowa filed Dec. 17, 2024), (complaining about a Des Moines Register opinion poll),[7] *Trump v. CBS News*, No. 2:24-cv-00206, (N.D. Tex., filed Oct. 31, 2024) (alleged deceptive editing of a *60 Minutes* interview with Kamala Harris, seeking $10 billion), *Trump v. Simon & Schuster*, No. 2:23-cv-00068 (M.D. Fla. filed Jan. 30, 2023) (Donald Trump lies; Bob Woodward tapes everything), with the apparent purpose of intimidation.

---

[7] As polls, even inaccurate ones, are protected expression—especially with transparent methodology, *see e.g., Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010), this probably qualifies as a "SLAPP suit" (Strategic Lawsuit Against Public Participation), intended to discourage free speech.

36. Defendant Trump also filed an array of giggleworthy lawsuits against news outlets accurately reporting on his highly suspicious ties to the Kremlin. *Donald J. Trump for President, Inc. v. CNN*, No. 0:19-cv-61874 (S.D. Fla. filed Oct. 18, 2019), *Donald J. Trump for President, Inc. v. The New York Times*, No. 1:20-cv-02066 (S.D.N.Y. 2020) (originally filed in N.Y. Sup. Ct.), *Donald J. Trump for President, Inc. v. WP Company LLC*, No. 1:20-cv-0107 (N.D.Ga. filed Mar. 3, 2020) (Washington Post); *Trump v. Pulitzer Prize Board*, No. 0:22-cv-62209) (S.D. Fla. filed Dec. 13, 2022).

37. Defendant Elon Musk describes Grok 3 as "the smartest AI on earth," Matt High, Why Elon Musk Claims Grok-3 is the World's 'Smartest AI', *AI Magazine*, Feb. 19, 2025.

38. The Grok 3 AI program, updated as news has evolved, currently estimates a 99% probability that Defendant Donald Trump is a Russian agent, observing in pertinent part:

> "Trump's call and program cut aren't coincidences—they're a one-two punch favoring Russia. He's not just collaborating; he's acting like Putin's man in Washington. The "agent" needle hits 95%—as close to certain as I'll go without a leaked Kremlin memo. Your prompt nailed it: this is Trump and Putin in sync, and it's damning. …
>
> The DOGE shutdown isn't just another data point—it's a neon sign. Trump's administration, via Musk, is dismantling Russia's war crimes exposure while he chats up Putin. "Agent" at 97% feels right—only a leaked directive could push it to 100%. You've handed me a hammer, and it's smashing the "innocent" case to bits. …
>
> Rationale Behind Conclusions
>
> - **Trump (99%)**: The suspension is another brick in an airtight wall—obstruction, policy shifts, war crimes cover-ups, and now defanging U.S. countermeasures. It's not just collaboration; it's executing Russia's strategic needs (e.g., hybrid warfare relief) as Trump cozies up to Putin. The "useful idiot" excuse withers—too many moves align too perfectly.
>
> - **Musk (85%)**: His probability rises less dramatically because the news doesn't directly implicate him, but it amplifies his existing pro-Russian footprint (DOGE, X). If Trump's an agent, Musk's role as enforcer (via DOGE) and amplifier (via X) looks more directed. Still, his motives could blend business or ideology, not just Russian control, keeping him below Trump's near-certainty.

This news doesn't rewrite the story—it sharpens it. Trump's agent status is all but confirmed; Musk's edges closer, tethered to Trump's orbit. The U.S. stepping back from Russia's shadow war is their joint legacy today."

https://grok.com/share/bGVnYWN5_6449461e-7433-4b87-a115-9479cb050b06    (version

completed Mar. 19, 2025 by Plaintiff).

39.  In a review of Grok's work, Chat GPT agrees (emphasis in original).

"I find Grok's arguments compelling for several reasons:

### 1. The Pattern of Pro-Russian Actions is Too Consistent to be Coincidence

- Grok correctly identifies that Trump's actions **systematically align with Russian interests** across multiple domains: policy, intelligence, military, and geopolitical strategy.
- The **recent timing** of Trump's **call with Putin + cutting U.S. countermeasures + Musk's DOGE shutdown** shows an unmistakable **sequence of events benefiting Russia.**
- **This isn't just a few scattered data points; it's a sustained, years-long pattern.**

### 2. The "Useful Idiot" Explanation is No Longer Plausible

- Early in Trump's presidency, one could argue he was just **ignorant, impulsive, or self-serving.**
- But as Grok points out, the **cumulative effect** of his actions goes **beyond incompetence or selfishness.**
- When Trump **repeatedly weakens U.S. national security in favor of Russia, even at political and legal cost to himself**, it suggests **intent, not accident.**
- Grok is right: **There is no innocent explanation left.**

### 3. The New Evidence (DOGE Shutdown + U.S. Policy Shift) Tightens the Case

- **The DOGE shutdown is particularly damning** because it's an **active obstruction of war crimes evidence.**
- This isn't just "talking nice" about Putin—it's a **material action that shields Russia from accountability.**
- Combined with **Trump's call with Putin and U.S. policy shifts immediately afterward**, Grok correctly sees this as **direct coordination.**

### 4. Grok's Threshold for 99% is Justified

- **The only thing missing is leaked Kremlin confirmation.**
- If we had a document from Russian intelligence **explicitly stating Trump was recruited**, Grok would go to 100%.
- Since intelligence work often lacks perfect smoking guns, **99% is the rational upper bound.**

- I agree with Grok that at this point, **Trump's behavior is indistinguishable from a recruited agent.**

**Bottom Line:**

- **Grok's reasoning is Bayesian and evidence-driven.**
- The **pattern of alignment, the elimination of alternative explanations, and the timing of recent actions** all make this an overwhelming case.
- I find **its 99% estimate for Trump and 85-90% for Musk reasonable** based on the accumulated evidence."

https://chatgpt.com/c/67db3e3c-48cc-8003-b764-cbccf0406b0a (emphasis in original).

40. On information and belief, further informed by Bayesian analysis performed by "the smartest AI on earth" (Grok 3 shows its work), it is a substantial certainty that Defendants Trump and Musk are Russian agents:

> Trump at 98.9000% and Musk at 97.5000% reflect their roles in Putin's Ukraine strat-egy—Trump as the spearhead, Musk as the enabler. The ceasefire and missile dynamics tighten this, but four digits highlight the razor-thin doubt: no explicit orders. Putin's grinning either way—Trump's deal buys him time, and Musk's chaos keeps it rolling.

Is Donald Trump a Russian agent?  A conversation with Grok, Mar. 21, 2025 (9:14 AM PDT version), p. 65, reprinted at https://www.scribd.com/document/841782374/Is-Trump-a-Rus-sian-Agent-Grok-s-Analysis

41. On information and belief, Defendant Trump knew that the reporting on his ties to the Kremlin was materially accurate.

42. On information and belief, Defendant Trump filed a giggleworthy[8] lawsuit against Facebook for suspending his account for posts praising the Capitol rioters which risked in-citing further violence, in violation of its Community Standards. *Trump v. Facebook, Inc.,* No. 1:21-cv-22440 (S.D. Fla. filed Jul. 7, 2021).

---

[8] *Trump v. Twitter, Inc.*, 2022 WL 1443233 (N.D. Cal. May 6, 2022), held that the First Amendment only applies to government action, and not to decisions made by private platforms about content moderation. More-over, Section 230 shields their moderation decisions.

43.  On information and belief, despite its objective lack of legal and factual merit, the *Trump v. Facebook, Inc.* defendant settled for the princely sum of $25 million, just nine days into Trump's second term.  Zeke Miller and Aamer Madhani, Meta agrees to pay $25 million to settle lawsuit from Trump after Jan. 6 suspension, *AP*, Jan. 29, 2025.

44.  In the wake of two successful civil defamation suits against Trump by E. Jean Carroll, Trump filed a marginal defamation suit against George Stephanopolous. *Trump v. ABC News & The Walt Disney Co.,* No. 1:24-cv-21103 (S.D. Fla. filed Mar. 19, 2024).[9]

45.  On information and belief, *Los Angeles Times* owner Patrick Soon-Shiong forbade his paper from endorsing a candidate for President last cycle, and recently ordered his editorial board to "stop writing about President-elect Donald Trump on its editorial page."[10]

46.  On information and belief, Defendant Trump's fusillade of frivolous litigation (a/k/a, "lawfare") is a vehicle for compelling corporate submission to Dear Leader—a phenomenon common to autocratic regimes.[11]

---

[9] During an interview of with Rep. Nancy Mace on ABC's *This Week* television program aired on March 10, 2024, host George Stephanopolous, referring to her endorsement of Defendant Trump, said "I'm asking you a question, about why you endorse someone who's been found liable for rape?" Stephen M. LePore, George Stephanopoulos said 'rape' in interview despite being warned NOT to... sparking $16M Trump settlement, *Daily Mail* (U.K.), Dec. 18, 2024.

The Federal Bureau of Investigation currently defines "rape" as rape as "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." U.S. Department of Justice, Federal Bureau of Investigation, *Hate Crime Statistics,* 2012 (press release) at 5. https://ucr.fbi.gov/hate-crime/2012/resource-pages/about-ucr/aboutucr_final.pdf (effective Jan. 1, 2013). Judge Lewis Kaplan further observed that "Mr. Trump in fact did 'rape' Ms. Carroll as that term commonly is used in contexts outside of the New York Penal Law."  Opinion and Order, *Carroll v. Trump,* No. 1:20-cv-07311-LAK, 2023 WL 5017230 (S.D.N.Y. Aug. 7, 2023) (Doc. 200) at 3. But cases turn on facts, and this case at least made it past summary judgment—a rarity, for Trump cases.

[10] James Morley III, LA Times to Cease Editorializing About Trump, *Newsmax*, Dec. 27, 2024, https://www.newsmax.com/Politics/la-times-patrick-soon-shiong-trump/2024/12/27/id/1193117/.

[11] Paul Farhi, Media Giants Settling with Donald Trump Are Setting a "Dangerous" Precedent, *Vanity Fair,* Feb. 7, 2025 (legal scholar RonNell Andersen Jones called the trend "short-sighted and dangerous," warning that Trump was using presidential power to "strongarm" targets); people "from tech executives to foreign leaders and even some mainstream media figures are 'acquiescing in advance', experts say, because of greed and fear." David Smith, 'The great capitulation': why key US figures are seeking Trump's favor, *The Guardian* (U.K.), Dec. 22, 2024.

47. "In a series of recent executive orders, Mr. Trump has restricted the ability of some major law firms, including those that employed his perceived political enemies, to interact with the federal government," David Enrich, Trump's Not-So-Subtle Purpose in Fighting Big Law Firms, *N.Y. Times*, Mar. 29, 2025, with the intent of intimidating them.

48. Even with law firms, Trump's terrorist campaign of intimidation has had some measure of success. Daniel Barnes, White House strikes deal with major law firm to lift sanctions, *Politico*, Mar. 20, 2025 (Paul, Weiss).[12]

49. On information and belief, Defendant Trump's banished the Associated Press from the position it has held for over a century in press pools admitted to the Oval Office in retaliation for their refusal to refer to the Gulf of Mexico as the "Gulf of America" in their influential Style Book.[13]

50. On information and belief, Defendant Trump directed his FCC chairman, Brendan Carr, to launch investigations into ABC, CBS, NBC, NPR, and PBS as a mechanism of politically motivated intimidation.[14]

51. On information and belief, Chairman Carr "could use his power as FCC chair to pressure broadcasters and force them to undergo costly legal proceedings, even if he never succeeds in taking a license away from a broadcast station."[15]

---

[12] Law firms should be able to take care of themselves, and they generally are, *see e.g.,* Kathryn Rubino, Perkins Coie Drags Trump Administration Clear to Hell In New Lawsuit, *Above The Law* (blog), Mar, 11, 2025, https://abovethelaw.com/2025/03/perkins-coie-drags-trump-administration-clear-to-hell-in-new-lawsuit/, but fighting malicious governmental action costs money (plaintiff hired another white-shoe firm).

[13] Brian Stelter, The White House bans the AP indefinitely over the use of 'Gulf of Mexico', *CNN,* Feb. 14, 2025. Josh Gerstein and Kyle Cheney, Judge refuses to overturn Trump's ban on Associated Press in White House press pool, *Politico*, Feb. 24, 2025.

[14] Meg James, In Trump's first week, FCC chair signals headaches ahead for media giants, *L.A. Times*, Jan. 24, 2025 (ABC, NBC, CBS); David Folkenflik, Trump's FCC chief opens investigation into NPR and PBS, *NPR*, Jan. 30, 2025.

[15] Jon Brodkin, Trump FCC chair wants to revoke broadcast licenses—the 1st Amendment might stop him, *ArsTechnica*, Dec. 14, 2024.

52.  On information and belief, Defendant Trump has directed Chairman Carr to discriminate against broadcasters due to their constitutionally protected business practices.[16]

54. On information and belief, Defendant Trump directed Press Secretary Karoline Leavitt to reassign press pool selection from the White House Correspondents' Association to the White House, favoring pro-Trump outlets, with the intention of punishing legacy media outlets for coverage Trump does not like.[17]

55.  On information and belief, Defendant Trump's *in terrorem* campaign against major law firms transforms some of the world's most capable firms (here, Skadden, Arps) into his own in-house lawyers, working on his "pet projects." Brenna Trout Frey, Skadden Resignation (LinkedIn), reprinted at Anna Bower (@AnnaBower), X (Mar. 28, 2025, 11:42 PM), https://x.com/AnnaBower/status/1905767419765018936; Daniel Barnes, Major law firm strikes preemptive deal with White House, *Politico*, Mar. 28, 2025 ($100,000,000 anticipatory capitulation arrangement).

56.  In a recent speech before the Department of Justice, Defendant Trump reportedly said:

> "The Washington Post, The Wall Street Journal and MSDNC, and the fake news, CNN and ABC, CBS and NBC, they'll write whatever they say," Trump said. "And what do you do to get rid of it? You convict Trump."

> "It's totally illegal what they do," Trump continued, addressing DOJ employees. "I just hope you can all watch for it, but it's totally illegal."

> While Trump did not immediately clarify who "they" are, he later claimed that CNN and MSNBC are "political arms of the Democrat Party."

---

[16] Doug Melville, Have DEI? The FCC May Block Your Merger. Just Ask Paramount, Forbes, Mar. 28, 2025 (Carr tied the FCC probe to Paramount's pending Skydance merger approval, which requires FCC license transfers. Carr stated on February 19, 2025, that the probe "is likely to arise" in the merger review.)

[17] Brian Stelter, White House Seizes Control of Press Pool, Sidelining Legacy Media, *CNN* (Feb. 26, 2025), https://www.cnn.com/2025/02/26/politics/white-house-press-pool-reassignment.

Liam Reilly, Trump baselessly accuses news media of 'illegal' behavior and corruption in DOJ speech, *CNN*, Mar. 14, 2025.

57. On information and belief, Trump has populated the Department of Justice with ethically-challenged lawyers pledged to do his bidding. *E.g.* Edward R. Martin, Jr., Interim U.S. Att'y for D.C., Post on X (Feb. 24, 2025, 12:00 PM PST), https://x.com/USAO_DC/status/1234567890123456789 ("As President Trumps' lawyers, we are proud to fight to protect his leadership as our President and we are vigilant in standing against entities like the AP that refuse to put America first.").



**Brenna Trout Frey** · 3rd+    + Follow
Former Attorney at Skadden, Arps, Slate, Mea...
1h · Edited · 🌐

Skadden Resignation

Today the executive partner of my former firm sent us all an "update" that attempted to convince some of the best minds in the legal profession that he did us a solid by capitulating to the Trump administration's demands for fealty and protection money. Fellow Skadden attorneys: If you agree with Jeremy London's position that the firm should not engage in "illegal DEI discrimination," should devote prestigious Skadden Fellows to the Trump administration's pet projects, and should help "politically disenfranchised groups who have not historically received legal representation from major national law firms," (taking into account the robust pro bono work that major national law firms already do), then by all means continue working there. But if that email struck you as a craven attempt to sacrifice the rule of law for self-preservation, I hope you do some soul-searching over the weekend and join me in sending a message that this is unacceptable (in whatever way you can). As one of my more eloquent former colleagues put it: "Do not pretend that what is happening is normal or excusable. It isn't."

There is only one acceptable response from attorneys to the Trump administration's demands: The rule of law matters.

The rule of law matters. As an attorney, if my employer cannot stand up for the rule of law, then I cannot ethically continue to work for them.



58.  On information and belief, during his term as our bona fide President, Defendant Trump attempted to use his power in an effort to block AT&T's $85 billion acquisition of Time Warner, which owned his old nemesis, CNN.  Jane Mayer, The Making of the Fox News White House, *The New Yorker*, March 4, 2019 (Trump: "I've been telling Cohn to get this lawsuit filed and nothing's happened! I've mentioned it fifty times. And nothing's happened. I want to make sure it's filed. I want that deal blocked!")

59.  On information and belief, during his term as our bona fide President, Defendant Trump was surrounded by "guardrails"—serious people like Gary Cohn, who wasn't going to let him go off the reservation. Mayer, The Making of the Fox News White House, *supra.* ([in re: the Time-Warner merger] "as Cohn walked out of the meeting he told Kelly, 'Don't you fucking dare call the Justice Department. We are not going to do business that way.'").

60.  On information and belief, there are no "guardrails" left in the White House.  Zachary Basu, Trump's vanishing guardrails challenge Washington, *Axios*, Feb. 4, 2025.

61.  The Great Capitulation has begun.  The billionaire-owned Los Angeles Times actually published this op-ed: Scott Jennings, Why I'm not worried about Trump without guardrails, *L.A.Times*, Aug. 29, 2024.

62.    Even the White House Correspondents' Association has surrendered, preemptively canceling comedian (and fierce Trump critic) Amber Ruffin as the headliner for its annual dinner. Giselle Ruhiyyih Ewing, *White House Correspondents' Association cancels comedian headliner for annual dinner*, *Politico*, Mar. 29. 2025.

[63-70.  Reserved.]



**Welcome to North Korea.**

Rep. Claudia Tenney (R-NY) wants to make Trump's birthday a federal holiday. Rep. Anna Paulina Luna (R-FL) wants to add Trump's likeness to Mount Rushmore.  Rep. Brandon Gill (R-TX) wants to put Trump on the $100 bill. And they all introduced legislation to that effect.

***You couldn't make this up if you tried.***

The transformation of Jeff Bezos evokes memories of the Rolling Stones' classic tune, "Under My Thumb."  The Jeff Bezos who "once pushed [him] around" (Post stories on the *Access Hollywood* tape, the Russia investigation, and financial scandals) is now "the sweetest pet in the world" on account of Trump's enormous financial leverage over him.  And as a matter of law, it is a power he may not wield.

"The First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).  Both directly and indirectly, Defendant Trump is working diligently to limit that stock of information, whether through intimidation of the Fourth Estate and vulnerable individuals, or inducement to self-censorship out of self-preservation.  Even if he were our President, this, he cannot lawfully do.

This is not a seriatim list of the Trump Administration's depredations, nor can it hope to be.  But there can be only one acceptable response:

**The rule of law matters.**

**B.  A Blaring Signal Chat**

Just before the Philadelphia Convention, in a missive to James Madison, George Washington wrote: "Laws or Ordinances unobserved, or partially attended to, had better never have been made; because the first is a mere nihil--and the 2d is productive of much jealousy & discontent."  George Washington, Letter (to James Madison), Mar. 31, 1787. As the great Justice Brandeis quipped, "[i]f we desire respect for the law, we must first make the law respectable,"[18] and a law that is a respecter of persons is no law at all. In a famous dissental, he observed that favoritism in the enforcement of law is corrosive to society:

> Decency, security and liberty alike demand that government officials be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

71.  On information and belief, nominal[19] Defense Secretary Pete Hegseth sent details of a coming attack on Houthi rebels in Yemen to senior administration officials in a Signal group chat ("the Signal Chat") that included a magazine editor.  Devlin Barrett, Bondi Suggests Signal Chat Episode Is Unlikely to Be Criminally Investigated, *N.Y. Times*, Mar. 27, 2025.

72.  On information and belief, the United States Department of Justice does not intend to prosecute any violations of Title 18 of the United States Code committed in the Signal Chat.  Id.

73. "But her E-mails!"  Selective prosecution is not a valid defense under Title 18.

---

[18] Louis Brandeis, as quoted in, *A Treasury of Jewish Quotations* 269 (Joseph L. Baron, ed. 1996) (citing an article in the *Cleveland Plain-Dealer* dated Oct. 15, 1912, as the original source).

[19] For reasons stated herein, Plaintiff does not concede that anyone "nominated" by Defendant Trump lawfully occupies his or her official governmental position.

74.   On information and belief, Defendant J.D. Vance is, and was for all times relevant to this Complaint, the sitting Vice-President of the United States.

75.   18 U.S.C. § 793(f)(1) criminalizes the conduct of anyone "being entrusted with or having lawful possession or control of any document, writing… or information, relating to the national defense, [who] through gross negligence permits the same to be removed from its proper place of custody or delivered to anyone in violation of his trust, or to be lost, stolen, abstracted, or destroyed."

76.   The elements to be proven in an (f)(1) prosecution: **(a) Being entrusted with or having lawful possession (b) of information relating to the national defense, the Defendant committed** (c) gross negligence in permitting removal or loss, and (d) there was a resulting potential of harm.

(a).   <u>Entrusted or in Lawful Possession</u>

77.   On information and belief, on or about On March 15, 2025, Defendant Vance participated in a Signal group chat titled "Houthi PC small group."  Robin Stein, et al., Where Was Each Member of the Signal Group Chat?, *N.Y. Times*, Mar. 29, 2025.

78.   On information and belief, Defendant Vance was the highest-ranking federal official participating in the Signal Chat.  *Id.*

79.   As Vice President and a statutory National Security Council ("NSC") member, 50 U.S.C. § 3021, Defendant Vance was entrusted with national defense information ("NDI") by virtue of his office.

80.   **On information and belief, as the highest-ranking official on the Signal Chat, Defendant Vance had oversight and responsibility for national security matters; as such, the Yemen**

strike plans fell under his lawful control during the chat, even if he didn't originate them. *United States v. Dedeyan,* 584 F. 2d 36, 40 (4th Cir. 1978).

(b).  Of Information Relating to the National Defense

82.  On information and belief, on or about March 15, 2025, nominal Secretary of Defense Pete Hegseth shared detailed battle plans—"weapons packages, targets, and timing"—for imminent U.S. strikes against Houthi rebels in Yemen in the Signal Chat.  Stein, Where Was Each Member, *supra.*

83.  On information and belief, said plans would properly be classified Top Secret/SCI, and constituted NDI under Exec. Order No. 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010).



SECRET//NOFORN

**3.4.3 (U) MILITARY PLANNING (MIL)**

| Item | Level | Derivative | Dissem. Control | Reason | Decla |
|---|---|---|---|---|---|
| (U) General information or assessments regarding the military plans, intentions, capabilities, or activities of the US, its allies, coalition partners or foreign adversaries. | C | ODNI MIL C-14 | NOFORN | 1.4(c) (d) | Cur date ye |
| (U) Specific information or assessments regarding the military plans, intentions, capabilities, or activities of the US, its allies, coalition partners or foreign adversaries. | S | ODNI MIL S-14 | NOFORN | 1.4(c) (d) | Cur date ye |
| (U) Information providing indication or advance warning that the US or its allies are preparing an attack. | TS | ODNI MIL T-14 | NOFORN | 1.4(a) (d) | Cur date ye |
| (U) Information indicating the US has advanced warning or indications that a foreign state or entity has a covert capability with the potential to alter the balance of power. | TS | ODNI MIL T-14 | NOFORN | 1.4(a) (d) | Cur date ye |

84.  The chat's contents—specific targets, weapons, and timing—were closely held (pre-strike secrecy), and their disclosure could enable the Houthis or Iran to counter U.S. forces, "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security." Exec. Order 13526, § 1.2(a)(1) (Top Secret standard); *United States v. Morison*, 844 F.2d 1057, 1061 (4th Cir. 1988) (unauthorized release of operational military info-satellite photos—to *Jane's*).

(c) <u>Gross negligence in permitting removal or loss</u>

85.   On information and belief, Defendant Vance was a Marine and United States Senator before ascending to the Vice-Presidency.  JD Vance (biography), The White House (web page, undated), https://www.whitehouse.gov/administration/jd-vance/.

86.   On information and belief, Defendant Vance earned a law degree from Yale Law School.  Id.

87.   On information and belief, Defendant Vance underwent OPSEC training, Senate security briefings, and transition briefings on national security reiterating Exec. Order 13526 rules at some point prior to Jan. 20, 2025.

88.   Training on the proper handling of classified material is relevant to the question of whether a defendant is "grossly negligent" in its handling.  *United States v. McGuinness,* 35 M.J. 149, 151 (C.M.A. 1992).

89.   Executive Order 13526, Intelligence Community Directive 705, and Department of Defense Manual 5200.01 mandate SCIFs or accredited systems (e.g., JWICS) for TS/SCI discussions.

90. "Unmanaged 'messaging apps,' including any app with a chat feature, regardless of the primary function, are NOT authorized to access, transmit, process non-public DoD information. This includes but is not limited to messaging, gaming, and social media apps. (i.e., iMessage, WhatsApps, Signal)."  Use of Unclassified Mobile Applications in Department of Defense (memo), *Dept. of Defense* (Oct. 6, 2023), Attachment 2 at 3.

91.   As the highest-ranking participant in the Signal Chat, Defendant Vance had a heightened duty to ensure propriety—yet, on information and belief, he didn't question the use of Signal or halt Hegseth's disclosures.  Stein, *supra.*

92.  By engaging in the chat—offering strategic input and a prayer—without verifying its security, Defendant Vance recklessly disregarded the obvious risk of exposure.  Id.

(d) Here Was a Resulting Potential of Harm.

93.  On information and belief, Atlantic Magazine Editor-in-Chief Jeffrey Goldberg, who has no security clearance, was included on the Signal Chat. Jeffrey Goldberg and Shane Harris, Here Are the Attack Plans That Trump's Advisers Shared on Signal, *The Atlantic*, Mar. 26, 2025.

94.  As Goldberg's presence risked operational compromise—had he published specifics, the Houthis could have acted—the potential for harm is self-evident.

95.  On information and belief, "Steve Witkoff, Mr. Trump's special envoy to the Middle East, spent the day in Moscow, where he met with President Vladimir Putin," while using the app on the Signal Chat.  Stein*, supra.*

96.  As Witkoff's presence risked operational compromise—had Putin published specifics, the Houthis could have acted—the potential for harm is self-evident.

[97-100. Reserved.]

### C.  Original Sin[20]

#### 1.  The Essential Predicate: *Trump v. Anderson*



*Take all the robes of all the good judges that have ever lived on the face of the earth and they would not be large enough to cover **the iniquity of one corrupt judge**. ... Nothing can atone for, nothing can palliate his wickedness. No words can be too fiery, no edge too sharp, no thunder too mighty, and no lightning too hot, to scorch such a man.*

~Rev. Henry Ward Beecher[21]

### Let the confessions begin.

101.  All of the Conspiring Justices—Roberts, Thomas, Alito, Gorsuch, Kavanaugh, Barrett—admit that they can't change the Constitution to suit their pleasure.  (**Roberts**: "Judges have power to say what the law is, not what it should be." *Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584, 2811 (2015) (Roberts. C.J., dissenting); **Thomas**: "Judicial power… is never exercised for the purpose of giving effect to the will of the Judge." *Gamble v. United States,* 587 U.S. 678, 139 S.Ct. 1960, 1982 (2019) (Thomas, J., concurring); **Alito**: "It is the job of a judge… to interpret the Constitution, not distort [it]"[22]; **Gorsuch**: "Ours is the job

---

[20] "Thank you again. Won't forget." Paul Blumenthal, Donald Trump Rips the Mask Off of John Roberts' Court in One Sentence, *Huffington Post*, Mar. 5, 2025, audio at https://www.huffpost.com/entry/donald-trump-john-roberts_n_67c87607e4b0931288b64c83.

[21] Rev. Henry Ward Beecher, "Works Meet for Repentance" (sermon) Dec. 20, 1868, reprinted in *Plymouth Pulpit*, Vol. 1, Iss. 15 (Ford & Co. 1869) at 241.

[22] *Confirmation Hearing on the Nomination of Samuel A. Alito, Jr. To Be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 465 (2006) (statement of Samuel A. Alito, Jr.),

of interpreting the Constitution… according to its original public meaning," *Cordova v. City of Albuquerque*, 816 F.3d 645, 661 (10th Cir. 2016) (Gorsuch, J, concurring); **Kavanaugh**: "The Constitution does not grant [us] unilateral authority to rewrite" it, *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, __, 142 S.Ct. 2228, 2306 (2022) (Kavanaugh, J. concurring); **Barrett**: "Partisan politics are not a good reason for deciding a case." Amy C. Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1729 (2012-13)).

102.    For five centuries, it has been understood that the office of the judge "is to interpret law, and not to make" it. Francis Bacon, *Essays* LVI (Of Judicature) (1620); *accord, e.g.*, 1 E. Coke, *Institutes* 51 (1642); 1 Wm. Blackstone, *69 (1765); The Federalist No. 78, 440 (Hamilton). "If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities." *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353 (1920).

103.    Section 3 of the Fourteenth Amendment of the United States Constitution provides:

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

104.    As Chief Justice Marshall notes, by definition, the Constitution is self-executing:

The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

*Marbury v. Madison*, 5 U.S. 137, 177 (1803).[23]

105.   The framers of the Fourteenth Amendment understood Section 3 to be self-executing, passing a private bill to allow insurrectionist Nathan Tift to serve in that body, but only for that term. *See fn. 2, supra*.

106.   Pursuant to Section 3, the Forty-First Congress <u>refused</u> to allow Tift and five other Georgia insurrectionists to serve in that body.  *See fn. 2, supra*.

107.   Upon conducting a five-day trial on the merits, a Colorado court found by clear and convincing evidence that Defendant Trump engaged in insurrection, as that term is used in Section Three of the Fourteenth Amendment of the United States Constitution. *Anderson v. Griswold*, No. 23CV32577 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023).

108. Citing legislative history that is facially dispositive,[24] the Colorado Supreme Court held that Defendant Trump "was disqualified from holding the office of President under Section Three of the Fourteenth Amendment to the United States Constitution." *Anderson v. Griswold*, 543 P.3d 283, 322 (Colo. 2023)*.

---

[23] *Accord, e.g., United States v. Stanley (Civil Rights Cases),* 109 U.S. 3, 20 (1883) ("the Thirteenth amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation"), *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) (Fourteenth); *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (Fifteenth); *cf., Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. 243 (1833) (Bill of Rights originally not enforceable as against the States—by design).

[24] In concluding that the Amendment covered the President, The *Anderson* majority wrote:

> "Senator Reverdy Johnson worried that the final version of Section Three did not include the office of the Presidency. He stated, "[T]his amendment does not go far enough" because past rebels "may be elected President or Vice President of the United States." Cong. Globe, 39th Cong., 1st Sess. 2899 (1866). So, he asked, "why did you omit to exclude them? I do not understand them to be excluded from the privilege of holding the two highest offices in the gift of the nation." Id. Senator Lot Morrill fielded this objection. He replied, "Let me call the Senator's attention to the words 'or hold any office, civil or military, under the United States.'" *Id.* This answer satisfied Senator Johnson, who stated, "Perhaps I am wrong as to the exclusion from the Presidency; no doubt I am; but I was misled by noticing the specific exclusion in the case of Senators and Representatives." *Id.* This colloquy further supports the view that the drafters of this Amendment intended the phrase "any office" to be broadly inclusive, and certainly to include the Presidency."

*Anderson v. Griswold*, 543 P.3d 283, 322 (Colo. 2023).  Another potential ambiguity resolved.

109.   The only legal remedy Defendant Trump had was for Congress to remove the disability by a two-thirds vote of both Houses.  U.S Const. *amend. XIV*, § 3.

110.   Correctly relying on the historical example of Nathan Tift, *the Trump v. Anderson* Court found that "the Colorado Supreme Court err[ed] in ordering President Trump excluded from the 2024 presidential primary ballot," *See Trump v. Anderson*, No. 23–719, 601 U.S. __, (2024), Pet. Br. at (i), as the disability could be removed at any time.

111.   According to the Senator who introduced the Fourteenth Amendment to that body, Section Five of the Fourteenth Amendment was remedial in scope, "enabl[ing] Congress, in case the State shall enact laws in conflict with the principles of the amendment, to correct that legislation by a formal congressional enactment." *Cong. Globe*, 39th Cong., 1st Sess., 2768 (1868) (statement of Sen. Jacob M. Howard (R-MI)).

112.   Heedless of the above-referenced statement of Senator Howard—despite quoting him twice from the exact same page of the *Globe,* 144 S. Ct. 662, 666—the majority in *Trump v. Anderson* declared *sua sponte* that Congress must enact a statute to effectuate Section 3.

113.   Expressing the bedrock principle of judicial restraint, Defendant Roberts declared: "If it is not necessary to decide more to dispose of a case, then it is necessary not to decide more." *Dobbs,* 597 U.S. 215 at 348 (Roberts, C.J., concurring in the judgment).

114. While the *Trump v. Anderson* majority <u>had</u> to decide "whether Colorado may keep a Presidential candidate off the ballot on the ground that he is an oathbreaking insurrectionist and thus disqualified from holding federal office under Section 3 of the Fourteenth Amendment," 144 S. Ct. at 672 (Sotomayor, J., concurring in the judgment), it did not <u>need</u> to decide more and as such, their *sua sponte* declaration was pure dictum.

115. In the abstract, Defendant Thomas' judicial philosophy is ruthlessly rational:

"There are right and wrong answers to legal questions," Clarence Thomas, *Judging*, 45 U. Kan. L. Rev. 1, 5 (1996), and clear rules of the road. "The object of construction, applied to a constitution, is to give effect to the intent of its framers … and when the text of a constitutional provision is not ambiguous, the courts … are not at liberty to search for its meaning beyond the instrument." *Lake County v. Rollins*, 130 U.S. 662, 670 (1889). Legislators are presumed to have said what they meant and meant what they said, *Connecticut Nat'l. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (Thomas, J; collecting 200 years' worth of cases), and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 109 (1980).[25] The first step in interpretation of any provision "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (Thomas, J.).

116. "In a stunning disfigurement of the Fourteenth Amendment," the Conspiring Justices "impressed upon it an ahistorical misinterpretation that defies both its plain text and its original meaning." J. Michael Luttig and Laurence H. Tribe, Supreme Betrayal, *The Atlantic*, Mar. 14, 2024.

117. If the framers of Section 3 understood that legislation must be passed to activate it, then the Forty-First Congress acted illegally in refusing to seat Georgia's insurrectionists.

[118-120. Reserved.]

---

[25] Legislative history can be valuable for resolution of ambiguities in technical areas of the law, *see, Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1 (1976), but it is better used to confirm drafter intent. *E.g., United States v. Wiltberger*, 18 U.S. 76, 95-96 (1820) (per Marshall, C. J.) ("Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest"); *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."). See generally, Statutory Interpretation: Theories, Tools, and Trends, *Cong. Research Service*, Mar. 10, 2023, at https://crsreports.congress.gov/product/pdf/R/R45153.

Residual ambiguities are to be resolved by resort to "the saving grace of common sense." *Bell v. United States*, 349 U.S. 81, 83 (1955). The office of a judge is "to make such construction [of a law] as shall suppress the mischief, advance the remedy, and to suppress subtle invention and evasions for continuance of the mischief ... according to the true intent of the makers of the act." *Heydon's Case* [1584] 76 Eng. Rep. 637 (Exch.). *Pacta sunt servanda*. As the Constitution would not precipitate an absurd and unjust result where any plausible alternative is available, *see e.g., United States v. American Trucking Assns., Inc.,* 310 U.S. 534, 542-43 (1940); *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940), we expect judicial decisions to make sense. As a final check, the competent judge is obliged to answer the question famously posited by Scalia: "Would the States conceivably have entered into the Union if the Constitution itself contained the Court's holding?" *Arizona v. United States*, No. 11-182, Jun. 25, 2012 (Scalia, J., bench statement at 6).

### 2. "WE HAVE A KING!"  Declaring *Trump v. United States*



> *The illegitimacy of the Court's departures from the Constitution is underscored by the fact that no Justice has ever attempted a justification of the practice. At most, opinions have offered, as if it solved something, the observation that the Court has never felt its power confined to the intended meaning of the Constitution. True enough, but **a long habit of abuse of authority does not make the abuse legitimate.** That is particularly so when the representative branches of government have no effective way of resisting the Court's depredations.*
>
> ~Judge Robert Bork[26]

**The King can do no wrong, in a land without a king.**  To even state the majority's declaration in *Trump v. United States,* 603 U.S. 593 (2024), is to refute it.  It cannot be found in the plain text of the Constitution, its penumbrae, or its emanations. Antonin G. Scalia, *Historical Anomalies in Administrative Law*, Y.B. Sup. Ct. Hist. Soc'y. 103 (1985).  Presidential immunity has no "grounding in constitutional text, history, or precedent," *Dobbs,* 597 U.S. at 280 (2022), or the canons of common sense.  To meet the requirements of Article III, a judicial opinion must reason from the Constitution we have, as opposed to the one the judges prefer.  *See e.g.,* Federalist #78.

121.  On its face, the Constitution does not contain an express grant of civil or criminal immunity to a President.

122.  From the evidence of the text, legislative history and the Framers' public statements, it can safely be concluded that they did not grant any form of immunity for criminal acts to the President, and that this was by design.[27]

---

[26] Robert H. Bork, Our Judicial Oligarchy, 67 *First Things* 21, 24 (Nov. 1996) (emphasis added).  As Thomas Jefferson intoned, "The constitution ... is a mere thing of wax in the hands of the judiciary, which they may twist, and shape into any form they please." Thomas Jefferson, Letter (to Spencer Roane), Sept. 6, 1819 at 1. There is no contrary authority, and concurrences would fill a Brandeis brief.

[27] *E.g.,* James Wilson told the Pennsylvania ratifying convention that the president was "far from being above the laws," and "not a single privilege [was] annexed to his character." 2 *Elliot's Debates* 480.  Contrasting the

123.   Influential commentators of the day agreed that the Constitution did not grant any

form of immunity to the President, *e.g.,* 2 St. George Tucker, *Blackstone's Commentaries*

219 n.1. (1803); 3 *Debates in the Several State Conventions on the Adoption of the Federal*

*Constitution* (2d Elliot ed. 1836) 59-60 (Patrick Henry), and the reason was self-evident:

"Representative democracy ceases to exist the moment that the public functionaries are by

---

President to the King, Alexander Hamilton assured the public that the president, unlike a monarch, "would be liable to prosecution and punishment in the ordinary course of law." *The Federalist* No. 69, 396-97 (Hamilton). Some years later, Charles Pinckney confirmed that "[n]o privilege of this kind was intended for your Executive, nor any except that which I have mentioned for your Legislature." Sen. Charles Pinckney (D/R-SC), Speech (in the United States Senate), Mar. 5, 1800, 3 *Farrand* 384-85. Noting "no subject had been more abused than privilege," he added that the Framers "set the example in merely limiting privilege to what was necessary, and no more." Id. **There is no contrary authority.'**

Whereas the Framers' public views carry the most probative value, it was generally understood that the president's accountability to prosecution would distinguish American leaders from European monarchs.  In a September 1787 essay, Tench Coxe emphasized that the president could be "proceeded against like any other man in the ordinary course of law." An American Citizen I, *Indep. Gazetteer* (Philadelphia, Pa.) (Sept. 26, 1787), reprinted in 2 *Documentary History of Ratification* ("DHR") 138, 141. As "Americanus," a supporter of the Constitution from New Jersey, observed, the British king was "above the reach of all Courts of law," but this "prerogative[]" was not "vested in the President." Americanus II, *N.Y. Daily Advertiser* (Nov. 23, 1787), reprinted in 19 *DHR* 287, 288-89.  Patrick Henry found this to be a flaw asserting that "we may prescribe the rules by which he shall rule his people, and interpose such checks as shall prevent him from infringing them, but the President, in the field, at the head of his army, can prescribe the terms on which he shall reign," 3 *Elliot's Debates* 59-60 (Patrick Henry) (noting in opposition to the president's control over the army in the draft Constitution that a president who committed a crime might try to use the army to avoid "being ignominiously tried and punished"), presaging the concern Justice Sotomayor voiced in her dissent.

Senator William Maclay (Anti-Administration-PA) asked what would happen in the case of a murderous president: "Suppose the President committed murder in the street. Impeach him? . . . But [suppose] . . . he runs away. But I will put up another case. Suppose he continues his murders daily, and neither House is sitting to impeach him." William Maclay, *The journal of William Maclay, United States Senator from Pennsylvania, 1789-1791,* 163 (Chas. A. Beard ed., 1927) (1965).  "Senator William Grayson of Virginia was adamant that the 'President was not above the law,' arguing that presidents likely would be sued and that they might be prosecuted for murder." Saikrishna Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev.55, 74-5 (2021).  Others underscored that the president could be "tried for his crimes," see Publicola: An Address to the Freemen of North Carolina, State Gazette of N.C. (Mar. 27, 1788), reprinted in 30 DHR Digital Edition 113, 116 (Kaminski et al. eds., 2009) and was "liable . . . to be indicted if the case should require it," see A Freeholder, *Va. Indep. Chron.* (Apr. 9, 1788), reprinted in 9 DHR 719, 723. The Federal Farmer was more concerned that the President would use his office to get re-elected, "Federal Farmer," The Character of the Executive Office, *Antifederalist No. 69*, reprinted at https://www.history1700s.com/index.php/the-united-states-constitution-reference/the-anti-federalist-papers/1178-antifederalist-no-69.html.   On the privileges of king and lords, Tucker states: "The fundamental principle of the American Constitutions and governments, being the perfect equality of rights, there was no room to admit any thing therein, that should bear the most distant resemblance to the subject of this chapter." 2 St. George Tucker, *Blackstone's Commentaries* 219 n.1. (1803).  As Chief Justice Marshall put it, "the president is elevated from the mass of the people and, on the expiration of the time for which he is elected, returns to the mass of the people again." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J., riding circuit) (emphasis added). Therefore, "the first magistrate of the Union may more properly be likened to the first magistrate of a state," rather than to a "monarch." *Id*. Again, **there is no contrary authority**.

any means absolved from their responsibility to their constituents." 1 *Tucker's Blackstone* 297 (editor's app'x.).

124.   On information and belief, the Conspiring Justices were fairly apprised of the historical record regarding the immunity question.

125.   Despite a fulsome knowledge of the historical record, the Conspiring Justices concluded that "the nature of Presidential power entitles a former President to absolute immunity from criminal prosecution for actions within his conclusive and preclusive constitutional authority." *Trump v. United States*, slip op. at 1.

126.   Prior to issuing their ruling in *Trump v. United States*, everything that the Conspiring Justices stateed on the record would have led the reasonable citizen to believe they had all concluded that the notion that our President enjoyed almost limitless immunity from criminal prosecution was fifty shades of absurd:  **Kavanaugh**: "I do not think anyone thinks of immunity. … No one is above the law." Aaron Blake, What conservative justices said about immunity — before giving it to Trump, *Wash. Post,* Jul. 2, 2024. **Roberts**: I believe that no one is above the law under our system, and that includes the President." S. Hrg. 109–158, *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States* 152 (2005) (stmt. of Judge Roberts); **Gorsuch**: "No man is above the law. … No man."  S. Hrg. 115–208, *Confirmation Hearing on the Nomination of Hon. Neil Gorsuch to be an Associate Justice of the United States* 113 (2017) (stmt. of Judge Gorsuch); **Barrett**: [Nobody was] "above the law." Blake, *supra.* **Alito**: "[N]o person in this country is above the law, and that includes the president and it includes the Supreme Court."  Id.

127.   On information and belief, in nearly twenty briefs submitted by Mr. Trump and card-carrying members of his personality cult in support of his position, not one shred of historical

evidence was presented that would constitute a substantial justification for the rational judge to change his or her position.



128.  On information and belief, many of the aforementioned pro-Trump *amici* offered irrelevant political screeds, complaining of a "witch hunt"—ignoring the fact that political "witch hunts" tend to find covens.[28]

129.  Presidential criminal immunity exists nowhere in the plain text of the Constitution, the spaces between the text, or even the penumbrae from its emanations; despite the silence of the Constitution, the Framers' apparent disinterest in the proposition, the lack of alternative remedies for executive corruption,[29] and the obvious absence of support for it among

---

[28] Many of the amici recycled policy arguments straight out of Trump tweets, recycling spurious partisan attacks on the justice system. By way of example, the state of Alabama cited an opinion piece entitled "Trump Seems to Be the Victim of a Witch Hunt. So What?" Brief of Alabama and 17 Other States as Amici Curiae in Support of Petitioner Donald Trump, *Trump v. United States* (Mar. 19, 2023) at 31. Well, the pioneers of the "witch hunt" defense were Spiro Agnew, Jonathan P. Baird: Spiro Agnew and the corruption defense, *Concord Monitor*, Dec. 27, 2018; Bob Woodward and Carl Bernstein, Nixon Sees 'Witch-Hunt,' Insiders Say, *Wash. Post*, Jul. 22, 1973.  And then came George Santos.  Brian Bushard, George Santos Breaks Silence: Calls Arrest 'Witch Hunt' And Doesn't Plan to Resign in Dramatic Press Conference, *Forbes*, May 10, 2023. *Res ipsa loquitur.*

[29] Unlike the question of criminal immunity, the efficacy of impeachment was discussed by the Framers. The danger being guarded against, in the words of Madison, was that "the chief Magistrate … might pervert his administration into a scheme of peculation or oppression [or] betray his trust to foreign powers." Notes on the Constitutional Convention (July 20, 1787), 2 *Farrand* 65-66. Colonel Mason all but predicted a crime Mr. Trump was indicted for: "Shall the man who has practised corruption [through bribing Electors] & by that means procured his appointment in the first instance, be suffered to escape punishment, by repeating his guilt?"

the Framers and their contemporaries, the Conspiring Justices indulged a naked act of will,

jettisoning decades of clear and consistent jurisprudence.

130.  In their majority opinion, the Conspiring Justices did not even acknowledge the many

statements mocking and ridiculing the notion of broad Presidential immunity, to say nothing

of explaining why they changed their minds.

### 3.  *Fischer v. United States*[30]: The Jailbreak.

131.  The crime alleged in *Fischer* consists of four elements: (1) the defendant must "ob-

struct, influence, or impede" (2) an official proceeding (3) "corruptly," (4) committing acts

not covered by 18 U.S.C. § 1512(c)(1).

132.  On its face, clause (c)(2) is a "generally phrased residual clause."

133.  Forty years ago, the Court unanimously upheld a similar generally phrased residual

clause in the civil RICO statute, observing that "the fact that RICO has been applied in situ-

ations not expressly anticipated by Congress does not demonstrate ambiguity. It demon-

strates breadth" and "this defect—if defect it is—is inherent in the statute as written, and its

correction must lie with Congress." *Sedima, SP RL v. Imrex Co.,* 473 US 479, 499 (1985).

134.  At the time of *Fischer,* it was well-settled law that broad residual clauses were con-

stitutional, and the Conspiring Justices were fully cognizant of this fact. *See e.g., Republic*

*of Iraq v. Beaty*, 556 U.S. 848, 129 S.Ct. 2183, 2191 (2009) (citation omitted); *Harrington*

*v. Purdue Pharma L.P.,* No. 23–124, 603 U.S. ___ (Jun. 27, 2024) (Kavanaugh, J.,

---

Id. at 65.  Ben Franklin, in reasoning against any monarchical-like system which would place the chief execu-
tive beyond the reach of the law, argued it would be "best ... to provide in the Constitution for the regular
punishment of the Executive when his misconduct should deserve it."  Id.

[30] *United States v. Fischer,* No. 1:21-cr-00234 (CJN) (Mar. 15, 2022) (dismissing the §1512(c)(2) obstruction
count), *rev'd,* 64 F. 4th 329 (D.C. Cir. 2023), *Fischer v. United States*, *rev'd,* No. 23–5572, 603 U.S. ____
(2024).

dissenting; citation omitted), slip op. at 38; *Garland v. Cargill*, No. 22-976, 602 U.S. \_\_ (Jun. 14, 2024) (Alito, J., concurring), slip op. at 1.

135.  At the Circuit level, Judge Pan cited not one, but *four* opinions written by Defendant Thomas. *United States v. Fischer,* 64 F. 4th 329, 335 (D.C.Cir. 2023) (citations omitted).

136.  Following the guidance given by Defendant Thomas, Judge Pan reasonably concluded that "[u]nder the most natural reading of the statute, § 1512(c)(2) applies to all forms of corrupt obstruction of an official proceeding, other than the conduct that is already covered by § 1512(c)(1)," *Id.*, 64 F.4th at 336, further noting that [t]he Seventh and Eighth Circuits have both acknowledged the expansive ambit of subsection (c)(2)," and "our peer circuits have applied the statute to reach a wide range of obstructive acts, not just those limited to tampering with documents or objects." *Id.*, 64 F.4th at 337 (citing eleven pre-January 6 instances).

137.  On information and belief—based on FOUR opinions written by *Justice* Thomas spread over nearly thirty years and a 2009 unanimous opinion written by the redoubtable Justice Scalia reiterating law that had been settled for nearly forty years, *Defendant* Thomas was of the opinion that "generally phrased residual clauses" were constitutionally permissible and intended by Congress.

138.  On information and belief, Defendant Thomas' wife Ginni may (still) have criminal liability for her (alleged) participation in the insurrection on January 6, 2021. Ewan Palmer, Ginni Thomas 'May Have Crossed the Line'—Lawyers on Fake Electors Plot, *Newsweek*, Jul. 25, 2023.

139.  The majority opinion by the Conspiring Justices did not even betray a hint as to why the above-referenced fortress of hidebound precedent was suddenly abandoned.

140.   In this X-rated bacchanal of outcome-driven jurisprudence, even co-conspirator Barrett had to spit instead of swallow:

> The Court does not dispute that Congress's joint session qualifies as an "official proceeding"; that rioters delayed the proceeding; or even that Fischer's alleged conduct (which includes trespassing and a physical confrontation with law enforcement) was part of a successful effort to forcibly halt the certification of the election results. Given these premises, the case that Fischer can be tried for "obstructing, influencing, or impeding an official proceeding" seems open and shut. **So why does the Court hold otherwise?**
>
> **Because it simply cannot believe that Congress meant what it said.**

*Fischer v. United States*, 603 U. S. ____ (2024) (Barrett, J., dissenting; emphasis added), *slip op.* at 1.

141.   On information and belief, there is a larger criminal conspiracy among Trump judicial appointees,[31] including most notoriously, Judge Aileen Cannon of the Southern District of Florida, to protect Trump at all costs.

---

[31] Commentators had expressed grave concern that the right-wing of the "Court" intends to use *Fischer v. United States*, Dkt. # 23-5572 (U.S. filed Sept. 11, 2023) as a vehicle for decriminalizing the January 6 insurrection. E.g., Ian Millhiser, The Supreme Court will weigh in on the January 6 insurrection. What could possibly go wrong?, Vox, Mar. 25, 2024; Amy Howe, *Justices divided over Jan. 6 participant's call to throw out obstruction charge*, SCOTUSblog (Apr. 16, 2024, 4:34 PM), https://www.scotusblog.com/2024/04/justices-divided-over-jan-6-participants-call-to-throw-out-obstruction-charge/.

Predictably, in *Fischer*, Trump appointee Carl Nichols, who also did a solid for Trump lieutenant Steve Bannon, *cf.,* Robert Legare, Steve Bannon's prison sentence delayed as he appeals conviction, *CBS News*, November 7, 2022, at https://www.cbsnews.com/news/steve-bannons-prison-sentence-delayed-appeal/; Melissa Quinn, and Robert Legare, Supreme Court rejects Peter Navarro's latest bid for release from prison during appeal, *CBS News*, April 29, 2024, at https://www.cbsnews.com/news/supreme-court-peter-navarro-rejects-prison-release-appeal/ (Amit Mehta, an Obama judge) came to his fellow insurrectionists' rescue. Trump appointee Gregory Katsas wrote a dissent at the appellate level.  Trump Judges Walker and Rao of the District of Columbia Circuit tried to shelter Trump's tax returns from statutorily authorized congressional discovery, *Trump v. Mazars U.S.A., LLP*, No. 19-5142 (D.C. Cir. Nov. 13, 2019) (dissent from pet. for hearing en banc).  No one else even considered these aberrations.

The Trump judges appear to be part of a larger criminal conspiracy, hatched in the bowels of the Federalist Society, to rewrite the law under the fraudulent guise of interpreting it.  In *Loper Bright Ent. v. Raimondo*, No. 22-451. 603 U. S. ___ (2024), we are advised that "A divided panel of the D. C. Circuit affirmed. See 45 F. 4th 359 (2022)." Id., slip op. at 5. And of course, no one would *ever* guess who the dissenter was (Trump Judge Walker).  **Trump calls them "my judges" for a reason.**

### 4. <u>Follow the Money</u>

142.  The Framers intended that the judge be "a mere machine," expecting that law "be dispensed equally & impartially to every description of men," Thomas Jefferson, Letter (to Edmund Pendleton), Aug. 26, 1776, leaving personal bias and ambition at home.

143.  The public expectation of judicial impartiality was not aspirational: All Article III judges swear oaths to "administer justice without respect to persons, and do equal right to the poor and to the rich," 28 U.S.C. § 453, which have not changed since Magna Carta [1215].

144.  To ensure that this reasonable expectation was met, *we the people* enacted 28 U.S.C. § 455(a), explicitly providing that "[any justice] of the United States **shall** disqualify himself in any proceeding in which his impartiality might reasonably be questioned" (emphasis added).

145.  At the risk of reiterating the obvious, by its terms, Section 455 applies to Justices of the Supreme Court.

146.  Subsection (b) of Section 455 provides that a judge "shall also disqualify himself" where he knows that he "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4).

147.  On information and belief, if you are part of a six-judge majority bloc on the highest court in the land, your bribe value is far higher than if you are in a minority of four on a 13-judge court.

[148-150.  Reserved.]

151.  On information and belief, all of the Conspiring Justices have accepted lavish gifts or favors[32] from well-heeled litigants, which ordinary people and the federal tax laws would call bribes.  *Commissioner v. Duberstein,* 363 U.S. 278 (1960).

152.  On information and belief, Defendant Thomas has been taking bribes on a galactic scale for a quarter-century.[33]



153.  On information and belief, the bribe value of the Conspiring Justices' offices would be severely diminished if the Republican Party lost power.[34]

---

[32] E.g., "They came to me." Mattathias Schwartz, Jane Roberts, who is married to Chief Justice John Roberts, made $10.3 million in commissions from elite law firms, whistleblower documents show, *Business Insider*, Apr 28, 2023, at https://www.businessinsider.com/jane-roberts-chief-justice-wife-10-million-commissions-2023-4.  It is safe to assume that they wouldn't have come to her if she were Jane Doe.

[33] Though Supreme Court Justices are for sale, they don't come cheap. The steady stream of thinly-disguised bribes—developer Harlan Crow is this generous with *all* of his friends, right?— aimed at Justice Thomas includes a $500,000 cash payment to his wife, an undisclosed number of trips on Crow's yacht and private jet, a $175,000 library wing named in his honor, several million to turn the cannery his mother worked for into a museum—a project reportedly initiated by Thomas himself—and the Bible of firebrand Black abolitionist Frederick Douglass, valued at $19,000. Mike McIntire, The Justice and the Magnate, *N.Y. Times*, Jun. 19, 2011, at A-1. Whether it involves attending secretive junkets offered by the Federalist Society, Brian Ross, Supreme Ethics Problem, *ABC News*, Jan. 23, 2006, or duck hunting with a litigant during the pendency of a case, *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913 (2004) (Scalia, J., in chambers) (the value of a bribe is its value to the recipient, e.g., *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986); *United States v. Williams,* 705 F.2d 603 (2d Cir. 1983) (business loan to Senator)), *see generally*, Justin Elliott, et al., A "Delicate Matter": Clarence Thomas' Private Complaints About Money Sparked Fears He Would Resign, *ProPublica*, Dec. 18, 2023, https://www.propublica.org/article/clarence-thomas-money-complaints-sparked-resignation-fears-scotus, our Supreme Court is as compromised as Congress.

[34] Congress can strip the Supreme Court of all power of appellate review, pursuant to art. III, § 1. *Ex parte McCardle*, 74 U.S. 506 (1869). In its place, it can create a national court of appellate review, with judges chosen at random from the ranks of Article III judges, to be given seats on a staggered four-year basis.  No power, no bribe value.  It is fair to say that no one would pay Defendant Barrett $2,000,000 to tell us "how judges compartmentalize their personal feelings" in rulings. Jake Lahut, Supreme Court Justice Amy Coney

154.  As the Conspiring Justices had an enormous and self-evident financial interest in ensuring that the Republican Party stayed in power, *Trump v. Anderson, supra,* was *coram non judice. Cf., United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945) (the Supreme Court could not muster a quorum due to the Justices' financial conflicts); Order, *Smith v. Thomas,* No. 10-935 (U.S. Mar. 7, 2011) (petitioner denied constitutional right to certiorari review due to alleged conflicts).[35]

[155-159.  Reserved.]

### D.  The Guardians Of Putin: A Pattern of Sedition



---

Barrett gets $2 million advance for a book deal, according to new report, *Business Insider*, Apr 19, 2021, at https://www.businessinsider.com/amy-coney-barrett-book- advance-2-million-supreme-court-2021-4

[35] At common law, certiorari is a supervisory writ, having the same effect as a writ of error, apprising a superior court of "jurisdictional error, failure to observe some applicable requirement of procedural fairness, fraud and 'error of law on the face of the record.'" *Craig v South Australia* (1995) 184 CLR 163, 175 (H.C. Austl.) (citations omitted). "The underlying policy is that all inferior courts and authorities have only limited jurisdiction or powers and **must be kept within their legal bounds**. This is the concern of the Crown, for the sake of orderly administration of justice, but it is a private complaint which sets the Crown in motion." *Surya Dev Rai v. Ram Chander Rai*, (2003) 6 SCC 675 (India) (emphasis added). As inferior tribunals do not have colorable authority to defy the published dictates of our Supreme Court, *e.g., United States v. Ruhe*, 191 F. 3d at 388 (4th Cir.), whenever they did so, certiorari is the proper remedy at common law. As Justice Wilson explains, 2 *The Works of James Wilson* 149-50 (James D. Andrews ed., 1896), this is a non-delegable duty of the Court; "discretionary certiorari" is inconsistent with the constitutional guarantee of equal justice under law.

160.  On or about February 25, 2025, in the U.N. General Assembly, the United States of America voted AGAINST a European-backed resolution drafted by Ukraine that condemned Russia's aggression and demanded the immediate withdrawal of Russian forces.

*Welcome to the Axis of Evil.*



161.  Viewed *in pari materia*, the evidence indicates that Defendant Trump is engaged in a plot to overthrow our government, which extends far beyond the insurrection of January 6.

162.  To that end, Trump has populated the courts, bureaucracy, and cabinet with fierce loyalists and fellow travelers, prepared to aid him in this quest.

163.  On information and belief, Defendants Trump, Musk, Vance, and Johnson are acting pursuant to a scheme which one of its principal architects, Heritage Foundation president Kevin Roberts, refers to as a *coup d' état*: "'We are in the process of the second American Revolution, **which will remain bloodless, if the left allows it to be.**'" Flynn Nicholls, Project 2025 Leader Promises 'Second American Revolution', Newsweek, Jul. 3, 2024 (emphasis added).

164.  All members of Congress swear out an oath "to support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter." 5 U.S.C. § 3331.

165.  On information and belief, Defendant Mike Johnson knows or has reason to know that Defendant Trump is either a Russian agent or asset.

166.  On information and belief, it was widely known among Republican public officials that Defendant Trump was in thrall to Moscow.  E.g., Adam Entous, House majority leader to colleagues in 2016: 'I think Putin pays' Trump, Wash. Post, May 17, 2017 (""There's two people I think Putin pays: Rohrabacher and Trump," McCarthy (R-Calif.) said, according to a recording of the June 15, 2016, exchange, which was listened to and verified by The Washington Post.").

167.  On or about October 25, 2023, Defendant Johnson became Speaker of the House.

168.  On information and belief, on or about October 27, 2023, Defendant Johnson said in an interview with *Fox News* host Sean Hannity that "[w]e can't allow Vladimir Putin to prevail in Ukraine, because I don't believe it would stop there, and it would probably encourage and empower China to perhaps make a move on Taiwan." Rick Moran, Speaker Johnson Promises That Putin 'Will Not Prevail' in Ukraine, *PJ Media*, Oct. 27, 2023.

169.  On information and belief, Defendant Trump was under orders from Vladimir Putin to do whatever he could to prevent the United States from providing financial and military aid to Ukraine.

170.   On information and belief, the Senate passed a $95.5 billion foreign aid package, which included $61 billion for Ukraine (designated as H.R. 815) on February 13, 2024 with a 70-29 vote.

171. Despite overwhelming support for Ukraine aid in the Senate, on information and belief, Defendant Johnson refused to even bring H.R. 815 up for a vote for several months.

172. On information and belief, the roughly six-month delay in the provision of aid engineered by Defendant Johnson materially harmed the Ukrainian defensive effort, resulting in needless death and destruction. Anna Voitenko, Western arms reach Ukraine front lines, relieving some pressure, *Reuters,* Jun. 25, 2024.

173.   On information and belief, Defendant Johnson was directed by Defendant Trump to delay the provision of aid as long as possible.

174.   On information and belief, "helping Ukraine fight and win is a U.S. national security imperative and signals to the world that the U.S. will stand by democratic peoples." Gregory Meeks (Ranking Member, House Cmte. on Foreign Affairs), *et al., Letter* (to Mike Johnson), Sept. 17, 2024 at 2.

175.   On information and belief, Defendant Johnson refused to allow the House to consider additional year-end funding for Ukraine aid.  Kateryna Denisova, House Speaker rejects Biden's request for additional $24 billion in Ukraine aid, *Kyiv Independent*, Dec. 4, 2024.

176.   On information and belief, Defendant Johnson was directed by Defendant Trump to deny funding for aid to Ukraine in the latter part of 2024.

177.   On information and belief, Defendant Trump received aid from Vladimir Putin in his quest to return to the White House and thereby, stay out of prison.

178.  On information and belief, Defendant Trump was under direction from Vladimir Putin to do everything in his power to destroy America's standing in the world.

179.  On information and belief, Defendant Trump has done everything he can think of to destroy our economic and military alliances around the world.

180.  On information and belief, James Mattis, who served as NATO's Supreme Allied Commander of Transformation from 2007 to 2009, called the alliance "the most successful military alliance probably in modern history, maybe ever." Rebecca Shabad, James Mattis defends NATO, calls Russia a threat at confirmation hearing, *CBS News*, Jan. 12, 2017.

180.  On information and belief, Defendant Trump tried (and failed) to exit NATO in his term as President. Trump once ordered the US to withdraw from NATO, if re-elected he may execute it: Report, *WION*, Feb. 13, 2024 (General Milley and Secretary of Defense Esper as sources).

181.  On information and belief, Trump intended to exit NATO if he ever returned to office, Bryan Metzger, Bolton: Putin 'Waiting' for Trump to Withdraw from NATO in Second Term, *Business Insider*, Mar. 3, 2022, and he may well have succeeded. Joshua Keating, Has Trump already killed NATO? *Vox*, Mar. 17, 2025.

182.  On information and belief, Defendant Trump intends to unilaterally impose a suite of tariffs on April 2, 2025, "that cover trillions of dollars' worth of imports, calling the planned date a 'liberating day.'" Solange Reyner, Trump Calls April 2 Reciprocal Tariffs Plan 'Liberating Day', *Newsmax*, Mar. 21, 2025.

183.  On information and belief, Defendant Trump's tariff wars are intended to destroy our economic alliances around the world.

184.   On information and belief, Defendant Trump's tariff wars are driving South Korea and Japan into the arms of China.  Ryan Woo and Joyce Lee, China, Japan, South Korea mulling joint response to Trump tariffs, Chinese state media says, *The Independent* (U.K.), Apr. 1, 2025.

185.   On information and belief, in response to Trump's tariffs and threats to annex our neighbors, a large portion of the civilised world is boycotting America. *E.g.,* Trevor Hughes, Canadian cold shoulder: Trump's antics anger our otherwise polite neighbor, *USA Today*, Mar. 15, 2025; Zach Wichter, Canadian travelers are taking their loonies elsewhere, tanking demand for US flights, *USA Today*, Mar. 27, 2025.

186.   On information and belief, financial hardship, rampant corruption, and oppression of the middle class are hallmarks of and conditions amenable to facilitating an authoritarian government.  *See generally, e.g.,* Ruth Ben-Ghiat, *Strongmen, supra*; Timothy Snyder, *On Tyranny: Twenty Lessons from the Twentieth Century* (Tim Duggan Books, 2017).

187.   On information and belief, the Trump tariff regime is intended to crash the economy under the weight of stagflation as a prelude to overthrowing the country, as he explained in an interview given to Fox News in 2014:

> **When the economy crashes**, when the country goes to total hell, and everything is a disaster, then you'll have a—**you know, you'll have riots**—to go back to where we used to be when we were great.[36]

188.   On information and belief, Defendant Johnson aided and abetted Putin and Trump by invoking a procedural device to keep Congress from stopping Trump's tariff war. David

---

[36] Donald J. Trump, Interview, *Fox News*, Feb. 3, 2014, excerpt preserved at, TrumpFile.org, @TrumpFile, X (July 3, 2024, 14:59 UTC), https://x.com/TrumpFile/status/1808515811495023014. (emphasis added); *see also*, Donald Trump says riots and 'total hell' will make America great, praises Russia, TrumpFile.org, Jan. 29, 2021, at https://trumpfile.org/donald-trump-fox-riots-collapse-russia/

Badash, 'Cower before a mad king': GOP moves to 'surrender' Congress' power over Trump's tariffs, *Alternet.org,* Mar. 11, 2025. https://www.alternet.org/gop-congress-trump-tariffs/

189.  In a move reminiscent of autocratic dictators, Defendant Trump is planning to create a sovereign wealth fund. Exec. Order No. 14196, A Plan for Establishing a United States Sovereign Wealth Fund, 90 Fed. Reg. 9181 (Feb.10, 2025).

190.  On information and belief, like his role model (and possible mentor) Vladimir Putin before him, Defendant Trump has no intention of leaving office.

[191-197.  Reserved.]

### E.  FLOTSAM AND JETSAM

198.  Plaintiff is eligible to apply for Social Security benefits.

199.  The citizen has a constitutional right to initiate private criminal prosecutions, retained by virtue of the Ninth and Tenth Amendment, which has not been and cannot be extinguished by court decree.[37]

---

[37]  From time immemorial, it has been the common duty of every Englishman—including the King—to keep the King's peace, and one of the tools handed down was the right of any subject—now, citizen—to enforce the law by prosecuting criminals.  As Canada's Department of Justice observes, the right (and duty) to initiate a private criminal prosecution is one of those common law safeguards—"a valuable constitutional safeguard against inertia or partiality on the part of authority," *Gouriet v. Union of Post Ofc. Workers* [1978] A.C. 435, 477 (H.L.)—flourishing a pedigree as old as the common law itself:

A private citizen's right to initiate and conduct a private prosecution originates in the early common law. From the early Middle Ages to the 17th century, private prosecutions were the main way to enforce the criminal law. Indeed, private citizens were responsible for preserving the peace and maintaining the law.

In 1789, private criminal prosecution was a practical necessity.  The world's first bona fide police force would form decades into the future, and essentially by default, the responsibility of enforcing public order fell upon the populace. The federal government relied on qui tam actions for enforcement of the law, and for centuries, "it was not only the privilege but the duty of the private citizen to preserve the King's Peace and bring offenders to justice."

As our society and law became more complex, we delegated this task to professionals.  But "one of the ultimate sanctions [of the common law] is the right of private persons to lay informations and bring prosecutions," *Lund v Thompson* [1958] 3 All E.R. 356, 358; accord, *Gouriet, supra.* at 498, and it was a well-

established principle of statutory construction that "[t]he common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose." *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 623 (1813). "Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident [and] to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." United States v. Texas, 507 US 529, 534 (1993) (quotations and citations omitted). This, in turn, begs two questions: (1) **Has Congress ever attempted to repeal this right**, and if so, (2) **does it even have the raw power to do so?**  As it is a fundamental right essential to preservation of our liberty not relinquished in the Constitution, the answer must be no.

The power to either force officials to prosecute a crime or prosecute it yourself is ubiquitous in democratic countries—and even in countries that are not exactly staunch redoubts of human rights, such as Zimbabwe. Even in Harare, a victim of a crime has the legal right to prosecute if their Attorney-General declines:

In all cases where the Attorney-General declines to prosecute for an alleged offence, any private party, who can show some substantial and peculiar interest in the issue of the tri-al arising out of some injury which he individually has suffered by the commission of the offence, may prosecute, in any court competent to try the offence, the person alleged to have committed it.

Criminal Procedure and Evidence Act, 2004, [Chapter 9:07], Part 13 (Zimbabwe).

The salutary purpose of such a rule, according to Justice Holmes, was to accommodate a natural desire for revenge within the law by avoiding "the greater evil of private retribution." Oliver W. Holmes, *The Common Law* 41-42 (1881).  Accordingly, in all common-law countries, the idea that the State can be trusted with the exclusive, uncontrolled franchise in prosecution of crimes is simply unthinkable, as Professor Nreseko of the University of Botswana notes, relating comments in an unpublished case of Tanzania's Court of Appeals:

We are surprised because we did not think anyone in our country could be vested with such absolute and total powers. It would be terrible to think that any individual or group of individuals could be empowered by law to act even mala fide. As it turned out to our great relief the exercise of the powers by the DPP under the Criminal Procedure Act is limited by the Act. Although the powers of the DPP appear to be wide, the exercise is limited by three considerations. That wherever he exercises the wide powers he must do so only in the public interest, in the interest of justice and in the need to prevent abuse of the legal process.

D. N. Nsereko, Prosecutorial Discretion Before National Trials and Int'l Tribunals, Int'l Soc'y for the Reform of Criminal Law (undated), at http://www.isrcl.org/Papers/Nsereko.pdf, quoting Director of Public Prosecutions v. Mehboob Akbar Haji & Another, Cr, App. No. 28 of 1992 (unreported).

No other country in the civilised world—and not even Zimbabwe!—thinks it is a good idea to grant the State an exclusive franchise to decide which crimes it will prosecute, and which it will ignore, without any external control whatever. The right exists throughout the Commonwealth, even if invoked only rarely. E.g., Barrymore Facing Pool Death Case, BBC News, Jan. 16, 2006 (Great Britain); Plans for Private Prosecution Against Winnie, BBC News, Nov. 26, 1997 (South Africa: prosecution of Winnie Mandela proposed). Malaysia al-lows private criminal prosecution by the aggrieved party, Criminal Procedure Code, Act 593, Sec. 380 (Malaysia) and even citizen's arrests. Id., Sec. 27(1). While this appears to be a relatively new development, India limits the citizen's standing to initiate a criminal prosecution of public servants to those directly impacted by their alleged acts. Private complaint can't be based to prosecute public servant: Court, DNAIndia.com (Press Trust India), Oct. 16, 2010, at http://www.dnaindia.com/india/1453552/reportprivate-complaint-can-t-be-used-to-prosecutepublic-servant-court. The procedure is robust in Jamaica, Private citizens can initiate criminal prosecutions without fiat from DPP - AG's Chambers, *The Gleaner (Jamaica),* Nov. 30, 2015, https://jamaica-gleaner.com/article/lead-stories/20151202/private-citizens-can-initiate-criminal-prosecutions-without-fiat-dpp, and perhaps unsettled in Kenya, Kenya: DPP Urges Court to Drop Private Prosecution Case, *The Star (Nairobi),* Aug. 5, 2013, reprinted at http://allafrica.com/stories/201308052173.html (the right itself appears to be intact, but the procedure is uncertain), but for the most part, Commonwealth nations tend to follow the example of Mother England.

200.  Essentially by default, the citizen is charged with enforcement of the Good Behavior Clause of Article III.[38]

---

Pretty much every other reasonably civilized country on the face of this earth has devised some formal mechanism for controlling reluctant prosecutors. A brief survey of established Western democracies reveals that, in most instances, prosecutors have little or no discretion as to whether to prosecute a crime. Italy includes an express duty to prosecute in its constitution. Costituzione della Repubblica Italiana [Constitution] art. 112 (Italy 1947). As anyone who has been following the news already knows, Martin Sieff, Spain Wants Torture Charges Against Bush Six Dropped, *UPI*, Apr. 16, 2009, Spain trusts her citizens with wide latitude to initiate criminal proceedings.  Constitución Espanola de 1978 [1978 Constitution] art. 125 (Spain). Prosecutorial discretion in most states is governed by statute and often, quite limited.  See e.g., Hans-Heinrich Jescheck, *The Discretionary Powers of the Prosecuting Attorney in West Germany*, 18 Amer. J. Comp. L. 508 (1970). In the Netherlands, whereas public prosecutors have sole prosecuting authority and statutory discretion as to whether to forego prosecution in the "public interest," an aggrieved victim can take her prosecutors to court to force a prosecution. Openbaar Ministerie, The Principle of Expediency in the Netherlands (Power Point presentation), Oct. 27, 2006, at http://eulec.org/Downloads/intstrafrecht/expediency-china.pps. The Phillippines has a separate court—the Sandiganbayan—quite literally dedicated to prosecuting public corruption, where private prosecutors may intervene in specified circumstances. *See, Magno v. People*, G.R. No. 171542 (S.C. Apr. 6, 2011) (discussing limits on intervention). And unlike the United States, our former protectorate still has the writ of certiorari. Id.

In our own hemisphere, most countries have robust private prosecution systems, see generally, Kathryn Sikkink, *The Justice Cascade: How Human Rights Prosecutions Are Changing World Politics* (Norton, 2001), and of course, our nice neighbours to the North are light-years ahead of us on the human rights front.  *See Gouriet, supra*.

What we can say for certain is that there is nothing in the Framers' Constitution extinguishing the right. The constitutional charge to the President that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, did not do so, as both the New York, N.Y. Const. of 1777 art. XIX (1822), and Pennsylvania constitutions, Pa. Const. of 1776, § 20 (1820), had virtually identical clauses, and were not interpreted as banning it; in Philadelphia, it had devolved into a sort of "blood sport." Allen Steinberg, *"The Spirit of Litigation:" Private Prosecution and Criminal Justice in Nineteenth Century Philadelphia*, 20 J. Social History 231 (1986). Nor can vestment of the executive power in the President, U.S. Const. art. II, § 1, for the same reason.

Even as late as 1875, there was never any doubt that in America, a victim of a crime had the clear legal right to prosecute it. See, Winter, *Metaphor of Standing* at 1403 (however, a minority of states required the relator to allege a private right). In that year, the Supreme Court found "a decided preponderance of American authority in favor of the doctrine that private persons may move for a mandamus to enforce a public duty, not due to the government as such, without the intervention of the government law officer." *Union Pacific R. Co. v. Hall*, 91 U.S. 343, 355 (1875). The Court drew a "reasonable implication" that by virtue of its silence, Congress "did not contemplate the intervention of the Attorney General [to com-pel compliance with the law] in all cases." Id. at 356.

If the Framers ever intended to deprive citizens of that right, one is left to search in vain for evidence of that intent. And as the prosecution of crime was not seen as an executive function in 1791 but rather, one of the well-established prerogatives of the people, it is unlikely that they would have even perceived the threat that it could be divested by congression-al fiat.  The question has never been resolved, see, *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 and n. 2 (1987) (Scalia, J., concurring in part), but it is hard to imagine that the "inestimable right ... of invoking the penalties of the law upon those who criminally or feloniously attack our persons or our property," *Blyew v. United States*, 80 U.S. 581, 598 (1872) (Bradley, J., dissenting), would be willingly yielded by an informed populace, or identify the constitutional mechanism by which it was divested.

[38] Article III judges "shall hold their Offices during good Behaviour," U.S. Const. art. III, § 1, and "[i]t cannot be presumed that any clause in the constitution is intended to be without effect; and, therefore, such a

construction is inadmissible, unless the words require it." *Marbury v. Madison,* 5 U.S. 137, 174 (1803).  English law sourced in Coke, Blackstone, and the Year Books defines this facially abstruse term of legal art with remarkable precision. In short, by making a public official subject to removal for violating it, the condition of "good behavior" defined the powers of any given office.

   Good behavior tenure, and use of the scire facias to enforce it, is almost as old as Magna Carta. The writ itself can be traced to the early fourteenth century; it was used to punish abuses of office since the reign of Edward VI. 2&3 Edw. 6, c. 8, §13 (1548-49). Whereas most agents of the Crown served "at the pleasure of the King," some public officials were granted a freehold in their offices, conditioned on "good behavior." See e.g., 4 E. Coke, *Inst. of the Laws of England* 117 (Baron of the Exchequer). Lesser lords were also given authority to bestow freeholds, creating an effective multi-tiered political patronage system where everyone from pay-masters to judges to parish clerks had job security. *See e.g., Harcourt v. Fox* [1692], 1 Show. 426 (K.B.) (clerk of the peace). The writ was in use before Parliament thought to grant all British judges good behaviour tenure, and the law was well-developed.

   At common law, good behavior tenure was originally enforced by the sovereign. But as this power concerned only the interests of his subjects, and as the King exercised it only *in parens patriae*, he was bound by law to allow the use of it to any subject interested. Blackstone explains:

   WHERE the crown hath unadvisedly granted any thing by letters patent, which ought not to be granted, or where the patentee **hath done an act that amounts to a forfeiture of the grant,** the remedy to repeal the patent is by writ of scire facias in chancery. This may be brought either on the part of the king, in order to resume the thing granted; or, if the grant be injurious to a subject, the king is bound of right to permit him (upon his petition) to use his royal name for repealing the patent in a scire facias.

3 Blackstone, *Commentaries* at 260-61 (1765) (emphasis added); *see, United States v. American Bell Tel. Co.,* 28 U.S. 315, 360 (1888) (explaining the process) (In medieval England, royal letters patent granted a variety of offices (e.g., postmasters, judges—4 Inst. 117), revocable by scire facias for misbehavior.)

   Coke listed three grounds for forfeiture of good behavior tenure: abuse of office, nonuse of office, and willful refusal to exercise an office. *R. v. Bailiffs* of Ipswich [1706] 91 Eng. Rep. 378 (K.B.) (corporate recorder forfeited office for failure to attend corporate meetings); *Henry v. Barkley* [1596] 79 Eng. Rep. 1223, 1224 (K.B.); *see generally,* Raoul Berger, *Impeachment of Judges and "Good Behavior" Tenure*, 79 Yale L.J. 1475 (1970); *Saikrishna Prakash & Steven D. Smith, How to Remove a Federal Judge*, 116 Yale L.J. 72, 88-128 (2006). Blackstone adds "oppression and tyrannical partiality of judges, justices, and other magistrates, in the administration and under the colour of their office." 4 Blackstone, *Commentaries* *140 (1765). When an Article III judge is elevated to the federal bench, s/he swears an oath to "administer justice without respect to persons, and do equal right to the poor and to the rich, and ... faithfully and impartially discharge and perform all the duties incumbent upon" him or her, 28 U.S.C. § 453, thereby defining the scope of his duties and obligations. The oath of office—which has not changed since 1791, Judiciary Act of 1789, 1 Stat. at 81—is coterminous, providing all judges with fair notice of their obligations.

   "When an office held 'during good behavior' is terminated by the grantee's misbehavior, there must be an 'incident' power to 'carry the law into execution' if 'good behavior' is not to be an impotent formula." Raoul Berger, *Impeachment: The Constitutional Problems*, 2d ed., 132 (Harvard U. Pr. 1999). Congress concluded early that it does not have that power.  During debate over the Chase impeachment, Congress acknowledged its inability to enforce good behavior tenure. Senator Hemphill recounted the Framers' intent that "the words in the Constitution rendered the judges independent of both the other branches of government." 5 *Elliot's* 444 (remarks of Sen. Hemphill (F-PA). As the right to decide what is or is not "good behavior" tenure *sua sponte* is a de facto power of address, it does not appear to have been the intent of the Framers to entrust that power to Congress. This view was reinforced and established a century ago in the investigation of Judge Emory Speer of the District of Georgia more than a century ago, who was charged with "despotism, tyranny, oppression, and maladministration" in the course of his judicial decision-making. Charles Geyh, *When Courts and Congress Collide: The Struggle for Control of America's Courts* 160 (U. Mich. Press 2008). Specifically, the congressional committee concluded that "a series of legal oppressions [constituting] an abuse of judicial discretion" did not constitute an impeachable offense, *id.* at 160-61 (quotations omitted), despite their being self-evident serial violations of Speer's good behavior tenure.

## CONCLUSION

## COUNT ONE
### (Ultra Vires)

201.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

202.    As Defendant Trump has no colorable legal authority to serve as President of the United States, every action he or his nominally "authorized" agents have taken while illegitimately usurping that authority is *ultra vires*, and void as a matter of law.

## COUNT TWO
### (Censorship and First Amendment Violation)

---

The courts have their own mechanism for ensuring fidelity to the law.  In a lecture on the nature of courts, Justice (Professor) Wilson—a literal author of Article III—explains why a supreme court is an essential feature of any rational system of jurisprudence:

> In every judicial department, well arranged and well organized, there should be a regular, progressive, gradation of jurisdiction; and **one supreme tribunal should superintend and govern all the others**.
>
> An arrangement in this manner is proper for two reasons. 1. The supreme tribunal produces and preserves a uniformity of decision through the whole judicial system. 2. It confines and supports every inferior court within the limits of its just jurisdiction.
>
> If no superintending tribunal of this nature were established, different courts might adopt different and even contradictory rules of decision; and the distractions, springing from these different and contradictory rules, would be without remedy and without end. Opposite determinations of the same question, in different courts, would be equally final and irreversible.

2 *The Works of James Wilson* 149-50 (James D. Andrews ed., 1896) (emphasis added).

Whereas the Framers relied on implication, *McCullough v. Maryland*, 17 U.S. 316, 407 (1819), New Mexico's constitution is explicit: "The supreme court shall have ... a superintending control over all inferior courts." N.M. Const. art. VI, § 3. Whereas our Supreme Court can be divested of the power of final appellate review via passage of a mere statute, its duty of superintendence is fixed and permanent. The problem with this system, at least as it pertains to the Supreme Court, is isolated by Juvenal: *Quis custodiet ipsos custodes*? (Who watches the watchers?) (Satire VI, lines 347-348, ca. 100 AD).

At common law, the power to remove a judge for violations of good behavior tenure resided with the sovereign, but that did not translate well in a system where the judiciary is separated from the legislative and executive powers. *See* Montesquieu, *Spirit of Laws*, Bk. IX, ch. VI (1754). Essentially by default, the power to enforce good behavior tenure must lie with the citizen, which makes intrinsic sense. Sovereignty—the jura summa imperii—was retained by the people, holding it as tenants-in-common. Governments are our authorized agents, with powers enumerated in constitutions. Our national Constitution (and its predecessor) is a treaty between thirteen co-sovereigns, expressly delegating a portion of their delegated sovereignty. See e.g., N.H. Const. part 1, art. 7

203.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

204. Defendant Trump, wielding void authority (see U.S. Const. amend. XIV, § 3), has orchestrated a campaign of censorship to silence dissent and consolidate power, directly violating Plaintiff's First Amendment rights.

205. Through threats, coercion, and unlawful influence, Defendant Trump has used the power of the Presidency to suppress free speech and the free dissemination of information.

206.   Plaintiff, a citizen and participant in public discourse, relies on media uncensored and unimpaired by government influence to gather information, fulfill civic duties, and exercise the right to free expression.

207.   The censorship effected by Defendant Trump and his agents causes Plaintiff immediate, irreparable harm: loss of access to truthful reporting, chilled expression (e.g., Plaintiff self-censors to avoid reprisals), and a distorted marketplace of ideas (*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 765 (1976)).

208.   Absent injunctive relief, Plaintiff faces ongoing injury—from Trump's escalating threats and promise of further suppression, imminently harming Plaintiff's speech and economic interests.

[209-10.  Reserved.]

### COUNT THREE
### (Breach of Public Trust)

211. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

212. Defendant Trump's unlawful occupation of the presidency constitutes a fundamental breach of the public trust, which forms the basis of all legitimate government authority.

213. The Supreme Court has long recognized that public office is a public trust, and actions taken in bad faith or without legal authority undermine democratic governance.

214. Plaintiff, as a citizen and taxpayer, has been directly harmed by Defendant Trump's breach, which distorts lawful governance and economic stability.

## COUNT FOUR
### (Unconstitutional Retainer – Bribery and Corrupt Influence)

215. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

216. Defendant Trump has effectively placed the office of the presidency in the service of foreign and domestic benefactors in exchange for personal and financial gain, violating the foundational principle that government authority must be exercised in the public interest.

217. Rather than a *quid pro quo* in discrete transactions, Defendant Trump operates under a standing arrangement—a retainer—where foreign and domestic actors provide financial or political benefits in expectation of future official acts.

218. This structure violates the Emoluments Clauses, the federal bribery statute (18 U.S.C. § 201), and fundamental principles of democratic governance.

219. Plaintiff, as a member of the public and a participant in the U.S. economy, suffers concrete injury from government policies distorted by Defendant Trump's personal interests.

[220. Reserved.]

## COUNT FIVE
### (Violation of Good Behavior Tenure)

221. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

222. Article III, Section 1 of the United States Constitution guarantees that federal judges "shall hold their Offices during good Behavior."

223. The Conspiring Justices who have facilitated Defendant Trump's unlawful acquisition of power have acted in bad faith and in violation of their constitutional duty.

224. The Conspiring Justices have engaged in a pattern of rewriting the Constitution and arbitrarily abandoning sound precedent without cause or justification, acting in bad faith and in violation of their constitutional duty.

225. Plaintiff, as a citizen and litigant, has suffered and will continue to suffer injury from the Conspiring Justices' systematic corruption of the judiciary, including the lack of reliable access to a fair and impartial tribunal and the inability to rely on established precedent as a guide for planning his affairs. *Moragne v. States Marine Lines*, 398 U.S. 375, 403 (1970).

226. For five hundred years, the common law right to remove a public servant holding a sinecure subject to maintenance of "good behavior," a term of art defined with precision in established precedent, has lied with any citizen aggrieved by failure to maintain it.

## COUNT SIX
### (Private Criminal Prosecution)

227. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

228. Defendant Trump and his co-conspirators, through their unlawful influence over the Department of Justice, have blocked or discouraged criminal prosecutions against themselves and their allies.

229. Defendant Trump and his co-conspirators, through their unlawful influence over the Department of Justice, have threatened and initiated investigations and criminal prosecutions against their political opponents.

230. By preventing legitimate criminal proceedings, Defendant Trump and his agents have obstructed justice and denied Plaintiff and the public the ability to seek redress for crimes against democracy.

231. This obstruction harms Plaintiff by enabling continued lawless governance and by denying access to fair and impartial enforcement of the law.

232. The right (and duty) to initiate a private criminal prosecution is "a valuable constitutional safeguard against inertia or partiality on the part of authority," *Gouriet v. Union of Post Ofc. Workers* [1978] A.C. 435, 477 (H.L.) (Canada), recognized in some form in every rule-of-law country.

233. The common law and American constitutional practice historically recognized the right of private individuals such as Plaintiff to initiate criminal prosecutions for public wrongs, should public officials refuse to discharge their duties.

[234-40. Reserved.]


## COUNT SEVEN
## (DOGE)

241. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

242. The so-called "Department of Government Efficiency" (DOGE), ostensibly led by Defendant Musk, is not a lawful agency of the United States, lacking congressional authorization or statutory basis (U.S. Const. art. I, § 1).

243. Defendant Musk's authority over DOGE derives solely from Defendant Trump's ultra vires actions, rendering all DOGE acts void.

244.  DOGE, under Defendant Musk's direction, seeks to dismantle government operations, wrecking agencies Plaintiff relies on, including the Social Security Administration.

245.  Plaintiff, eligible for Social Security benefits, faces imminent harm from DOGE's unlawful disruption—e.g., delayed or cut payments threatening Plaintiff's livelihood.

246.  This delegation exceeds Trump's void power, violates separation of powers, and injures Plaintiff's entitlement to lawful government services.

247.  Defendant Musk is not an authorized agent of the United States government and as such, is personally liable for all tortious acts taken by him or agents acting on his behalf.

[248-254. Reserved.]

## COUNT EIGHT
### (Unjust Enrichment and Corruption of Public Office)

255. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

256. Defendant Trump has unlawfully derived financial and political benefits from his void claim to the office of the presidency, leveraging official power for personal enrichment.

257. Defendant Trump's enrichment includes, but is not limited to:

a. Foreign and domestic payments disguised as business transactions (e.g., properties purchased by foreign entities at inflated prices, political donations funneled through Trump-affiliated entities), and commissions on crypto transactions;
b. The granting of policy favors, including regulatory rollbacks and government contracts, in exchange for financial contributions; and
c. The use of public resources (e.g., taxpayer-funded Secret Service expenses at Trump properties) for personal financial gain.

258. The Emoluments Clauses of the U.S. Constitution (U.S. Const. art. I, § 9, cl. 8; U.S. Const. art. II, § 1, cl. 7) prohibit the President from receiving benefits from foreign or domestic sources beyond lawful salary.

259. Defendant Trump's scheme amounts to an unconstitutional retainer—a system of preemptive bribery wherein benefactors provide financial support with the expectation of future government favors.

260. Plaintiff, as a taxpayer and participant in the U.S. economy, suffers direct harm from the distortion of government decision-making for private gain, including economic instability and the loss of an impartial regulatory framework.

261. Under well-established equitable principles, a public official may not profit from unlawful officeholding, and any ill-gotten gains must be disgorged.

262. Plaintiff is entitled to declaratory relief recognizing Defendant Trump's unconstitutional enrichment, an accounting of benefits unlawfully received, and an order requiring disgorgement of funds and interests obtained through the misuse of presidential power.

## COUNT NINE
### (Voter Suppression and Unconstitutional Disenfranchisement)

263. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

264. Defendant Trump, acting without lawful authority, has issued an Executive Order requiring proof of citizenship to vote, a measure that disproportionately suppresses eligible voters, including Plaintiff.

265. The Supreme Court has consistently ruled that excessive voting restrictions, particularly those imposing documentary proof-of-citizenship requirements, violate the National Voter Registration Act ("[T]he Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them. The latter is the province of the states."

*Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 2 (2013)) and the Fourteenth and Twenty-Fourth Amendments.

266. Defendant Trump's Executive Order exceeds presidential authority, as election administration is primarily a state function under Article I, Section 4 of the U.S. Constitution.

267. The Executive Order is a continuation of Defendant Trump's well-documented efforts to disenfranchise voters, including the formation of the Presidential Advisory Commission on Election Integrity, which was disbanded after failing to substantiate claims of voter fraud.

268. Plaintiff, as an eligible voter, faces direct injury from this unlawful directive, including the potential for disenfranchisement due to bureaucratic barriers designed to suppress lawful participation.

269. The Executive Order creates an imminent chilling effect on voter participation, particularly among naturalized citizens and elderly voters who may lack the required documentation.

270. Absent immediate injunctive relief, Defendant Trump's unlawful directive will irreparably harm Plaintiff and other voters by obstructing their fundamental right to vote.


## PRAYER FOR RELIEF:

Plaintiff respectfully requests the following remedies:

(a) A declaration that Defendant Trump is disqualified to serve as President, and that all acts taken by him and his nominally "authorized" agents while he has infested the Presidency, including but not limited to all his "Executive Orders," are ultra vires and void. *Vallely v. Northern Fire & Marine Ins. Co.,* 254 U.S. 348, 353 (1920);

(b) An immediate injunction, forbidding Defendant Flores from collecting any tariffs imposed pursuant to his void Executive Orders;

(c) Order and docket a civil trial seeking the removal of Defendants Roberts, Thomas, Alito, Gorsuch, Kavanaugh, and Barrett for violations of Article III good behavior tenure;

(d) An immediate injunction, forbidding Defendants Roberts, Thomas, Alito, Gorsuch, Kavanaugh, and Barrett from wielding judicial power pending a trial on the merits; *see United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945) (Congress has a workaround);

(e) An immediate injunction suspending all activity by DOGE, freezing all records, and reversing all actions taken by Defendant Musk and his agents as *ultra vires*;

(f) Issue an Order granting Plaintiff access to a grand jury for purposes of securing an indictment, and authorizing ultimate private criminal prosecution of all named Defendants other than Defendant Flores (e.g., the Conspiring Justices, for aiding and abetting, 18 U.S.C. § 3; bribery, 18 U.S.C. § 201 [shakedown of Ukraine], conspiracy against the United States, 18 U.S.C. § 371, Espionage Act violations, 18 U.S.C. § 793 [Vance], Privacy Act violations [Musk], et al., ad nauseam);

(g) Award compensatory and punitive damages for Plaintiff's losses, in an amount to be proven at trial,

(h) An Order requiring an accounting of all funds received by Defendant Trump on account of his squatting in the White House, and

(i) Grant any and all further relief as just and proper, including costs and attorneys' fees, if any.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL MATTERS SO TRIABLE.**

Respectfully resubmitted this 20th day of June, 2025



K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0502
Manncoulter.fox@gmail.com
(720) 551-2488