**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 25-cv-01042 (CJN)**

K.L. SMITH,

             Plaintiff,

v.

PETE R. FLORES, et al.,

             Defendants.

---

**MOTION FOR RECONSIDERATION PURSUANT TO RULE 59(E)
(INCORPORATING AUTHORITY)**

---

Plaintiff K.L. Smith moves the Court for relief pursuant to Fed. R. Civ. P. 59(e), stating as follows in support:

## INTRODUCTION

*For myself it would be most irksome to be ruled by a bevy of Platonic guardians,
even if I knew how to choose them, which I assuredly do not.*
          ~Learned Hand, The Bill of Rights 73 (1958).

The problem with this case is the case itself. It challenges conventional doctrinal boundaries and requires engagement with constitutional structure, history, and institutional limits—matters that cannot be resolved through cursory treatment.  But as Judge Wood of the Seventh Circuit rightly observes, federal judges are necessarily generalists, with knowledge "a mile wide and an inch deep."[1] That institutional reality imposes a duty on the courts to take the time necessary to engage with well-supported submissions.

---

[1] Diane P. Wood, *Generalist Judges in a Specialized World*, 50 S.M.U. L. Rev. 1755, 1756 (1997).

1

RECEIVED
JAN 30 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Plaintiff assumed the burden of supplying the Court with extensive historical and doctrinal analysis, necessarily weaving together multiple strands of constitutional theory. The resulting Complaint was dense, but deliberately and unavoidably so.  Its complexity was not obfuscatory; it was intrinsic to the claims asserted.

As Thomas Jefferson explained, the delivered opinion is the judge's warranty to the litigants and an interested public that law is being "dispensed equally & impartially to every description of men."[2] While a cogent written decision proves that the judge "has read the papers, that he has considered the case, that in the application of the law to it, he uses his own judgment independently and unbiased by party views and personal favor or disfavor."[3]  By stark contrast, as the Wisconsin Supreme Court observes,

> [a]n unreasoned decision has very little claim to acceptance by the defeated party, and is difficult or impossible to accept as an act reflecting systematic application of legal principles. Moreover, the necessity of stating reasons not infrequently changes the results by forcing the judges to come to grips with nettlesome facts or issues which their normal instincts would otherwise cause them to avoid.

*Wisconsin v. Allen,* 778 N.W.2d 863, 877-78 (2010) (internal quotation omitted).

That something was amiss was evidenced by the Court's admission that it found the Complaint too abstruse to understand.  This is a tacit confession that the Court has not "come to grips with nettlesome facts or issues."  If there is genuine confusion, Rule 59(e) affords a litigant a reasonable opportunity to correct that misapprehension.  And as all the heavy lifting has already been done in papers already filed, the best way to make the Complaint's contentions more understandable is to distill them to essentials:

---

[2] Thomas Jefferson, Letter (to Edmund Pendleton), Aug. 26, 1776 at 2.

[3] Jefferson, Letter (to Judge William Johnson), Mar. 4, 1823 at 3.

I.   An oath-breaking adjudged insurrectionist, not absolved by Congress, is constitutionally barred from serving as President. U.S. Const. amend. XIV, § 3. Donald Trump swore an oath to support the Constitution (a stipulated fact).  He was found by a competent court to have engaged in insurrection (an adjudicated fact).  He has not been absolved by Congress (a judicially noticeable fact). (Complaint, ¶¶ 101-120; Counts One, Three).

   A.  The trial court's holding has not been disturbed by any court.

      1.  Under the doctrine of collateral estoppel, the adjudicated fact is not open to relitigation.

   B.  The Fourteenth Amendment is self-executing.

      1.  Congress does not have to do anything to make the Section enforceable.

      2.  Historical evidence shows that the intended remedy was a writ of quo warranto.

   C.  In 1869, any citizen could enforce Section 3.[4]

   D.  By definition, any action taken by Trump as "President" is void ab initio.[5]

      1.  Ergo, all of his "appointments" and pardons are nullities.[6]

      2.  DOGE acted without lawful authority; liability in tort.

II.   The Constitution is our paramount law.  U.S. Const. art. VI, cl. 2.

   A.   The Constitution is "unchangeable by ordinary means."  Marbury at 176.

      1. Ergo, the Defendants cannot change it by interpretation. (Complaint, ¶ 101)

         a.  The Clarence Thomas Doctrine[7]: The Constitution is not what the judges say it is, but what the Constitution says it is, and "There are right and wrong answers to legal questions." (Complaint, ¶ 115)

---

[4] Historical support from Berger, Jaffe, and Pushaw.

[5] This is basic agency law.  Hamilton explains this principle in Federalist No. 78.

[6] The "de facto officer doctrine" ONLY protects innocent third-parties, as was the case in Britain.

[7] From his *Gamble* concurrence—in Plaintiff's opinion, possibly the best summation of originalism ever.  Traceable to Bacon, the Framers' writings, and *Marbury v. Madison*.  See also, Complaint, ¶ 115.

2.   Judicial opinions inconsistent with the Constitution are void.[8]

B.   Improper judicial acts may give rise to criminal liability.[9]

1.   Remedy: Private criminal prosecution (Count Six)

a.   *Quis custodiet ipsos custodes?* The Department of Justice does not have exclusive authority to prosecute crimes for a reason.[10]

b.   Private criminal prosecution: a common law safeguard embedded in the Fifth and Tenth Amendments.[11]

c.   Signalgate (Complaint, ¶¶ 71-99) is why we need it.

C.   Improper judicial acts void a judge's sinecure.

1.   Remedy: Civil action pursuant to writ of scire facias (Count Five).

a.   Examples of malfeasance: *Trump v. US* (¶¶ 121-130); *Fischer* (¶¶ 131-142)

b.   18 U.S.C. § 455 is not merely a polite suggestion. (¶¶ 143-153)

2.   Scire facias is a writ of the sovereign (Blackstone);

a.   In our system, the citizens are the sovereign; our officials are our agents.

b.   Congressional enforcement would convert it into a power of address.

III.   "*Russia, Russia, Russia*" is about the Benjamins.

1.   Evidence. (Complaint ¶¶ 160–198).

a.   Trump is alleged to be engaged in an ongoing effort to undermine and ultimately overthrow the constitutional order.[12]

b.   That effort is marked by consistent alignment with authoritarian regimes, (e.g., ¶ 160) and with Vladimir Putin's articulated vision of a "multipolar world."

---

[8] From Blackstone to CASA—an unbroken string of precedent.  Cf., Planned Parenthood v. Casey.

[9] From *Ex parte Virginia* to *United States v. Dugan*.

[10] Historical examples, from King James I to Stalin.

[11] *Costello* (grand jury), *Lund/Gouriet* (common law right).  Separation of powers argument, presented by Madison: PCP is ubiquitous in some form throughout the Western world.  Russia and China, not so much.

[12] Evidence includes the tariffs (cf., Smoot-Hawley), the demolition of NATO, and Russia-friendly foreign policy. If Trump were a Russian agent, how would he have acted differently?

c. "'We are in the process of the second American Revolution, **which will remain bloodless, if the left allows it to be.**'" (¶ 163).

d. Subsequent evidence: War crimes in Venezuela, threatened invasion of Greenland, thousands of crimes committed against citizens in Minnesota—judicially noticeable.

2. Corruption on a galactic scale (Count Four, Seven, Eight).

a. Foreign and domestic emoluments and quid pro quos.  Judicially noticeable.

b. List of incidents—e.g., crypto, real estate deals, DOGE contracts—is growing exponentially.

c. Our Department of Justice is a "lion under the throne," incapable of acting as an independent agency.

d. Remedies include declaratory and injunctive relief and disgorgement.

e. This is a public law case; standing was never required. Berger/Jaffe/Pushaw.

3. Lines of discovery

a. The Epstein Files – *always* follow the money.[13]

b. Tax/financial records to ascertain the amount to be disgorged.

c. Unauthorized acquisition and use of Social Security data.[14]

d. The Palantir surveillance contracts, and threats to privacy.[15]

Experts who study the fall of democracies and authoritarian capture agree that Trump's conduct tracks the dictators' playbook. See, e.g., Timothy Snyder; Jason Stanley. That there is a rabbit hole can no longer be responsibly disputed; how far it goes can only be revealed by the evidence.  The

---

[13] Per Sen. Ron Wyden (D-OR), the money trail leads to Russia.  As Trump Sits on Key Epstein Files, Wyden Lays Out "Follow the Money" Investigation for DOJ, Sen. Finance Cmte., Jul. 23, 2025.  It always has. See Maison d'Amitie.

[14] This is frighteningly real.  *See AFSCME v. Social Security Admin.,* No. 1:25-cv-00596-ELH, Dkt. #197  (D. Md. filed Jan. 16, 2026).

[15] This is also frighteningly real.  See Nicole M. Bennett, When the government can see everything: How one company–Palantir–is mapping the nation's data, *The Conversation*, Aug. 27, 2025.

risk of the creation of a surveillance state, with attendant threats to core liberties, cannot responsibly be dismissed as fanciful or speculative. Because Trump is not constitutionally eligible to serve as President, these acts—taken under color of presidential authority—give rise to potential liability in tort.  But disgorgement is the holy grail here: The wrongdoer may not profit from his crimes.

The Court need not resolve every factual allegation raised by the Complaint to grant interim relief. It need only address a narrow legal question: whether a person adjudicated to have engaged in insurrection, and not absolved by Congress, is constitutionally eligible to serve as President. If the answer is no—as the text and history of Section 3 compel—then actions taken under color of that office lack lawful authority. The remaining questions of scope, motive, and liability are matters best left for further proceedings, informed by evidence rather than assumption.

## "LET THE JUDGE BE A MERE MACHINE"

The incomparable Thomas Jefferson summarized five hundred years of consensus on the science of judging into that simple phrase.  He famously wrote that

> we all know that permanent judges acquire an Esprit de corps, that being known they are liable to be tempted by bribery, that they are misled by favor, by relationship, by a spirit of party, by a devotion to the Executive or Legislative; that it is better to leave a cause to the decision of cross and pile, than to that of a judge biassed to one side;

Thomas Jefferson, Letter (to L'Abbe Arnoux), Jul. 19. 1789.

Jefferson and Scalia[16] would agree that it's not really cricket for a judge to sit in judgment of a case where the fortune and freedom of a jurist with whom he has a close relationship is at risk. *See Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876-84 (2009).  But a machine is not subject to temptation.  Accordingly, as a Rule 11 due-diligence check, Plaintiff routinely uses large language models as cross-checks to test whether propositions are facially sound. See Exhibit A. The

---

[16] *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913 (2004) (Scalia, J., mem.).

historical scholarship is consistent: standing was not required in public-rights cases at the Found-

ing, and the modern doctrine is an impermissible judicial accretion to the Framers, as the CASA

opinion appears to presage.  But there is no reason to fight that battle if it is unnecessary, as is the

case here.  Let us return to the analysis of the Complaint.

IV.   The Superior Court case was based on a statute.

    A.   In theory, a writ of quo warranto could have been issued at 12:01 P.M. on
       January 20, 2025.

    B.   At that moment, the constitutional violation was structurally immune from review
       under modern standing doctrine, because no one on the planet could have satisfied
       *Lujan.*

 This is why the second case was filed.  As laws must be construed to avoid absurd results, a

doctrine rendering a constitutional violation immune from judicial review cannot apply.  *See, e.g.*,

*United States v. Kirby*, 74 U.S. 482, 486-87 (1869); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S.

564, 575 (1982). Accordingly, modern standing doctrine cannot bar the claims asserted here.

The statutory price of entry, however, was affording the government its right of first refusal,

which precipitated an unfortunate but unavoidable delay.  For this reason, the consolidated dismis-

sal of these cases constituted plain error.  But the original Complaint remains viable, irrespective

of the procedural delay.

V.   Plaintiff's constitutional rights have been impaired (Complaint, ¶ 32).

   A.   Standing is automatic in public law cases.  Berger, Jaffe, et al.

   B.   Alternatively, Trump's war on the information space violates the First Amendment.[17]

      1.   The *Washington Post's* reportage has been compromised (Complaint, ¶¶ 11-70).

---

[17] *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976) (right to hear unpol-
luted information).

    a.   Plaintiff is a *Post* subscriber (Complaint, ¶ 11).

    b.   As not all citizens are *Post* subscribers, Plaintiff has suffered a concrete and particularized injury sufficient to confer standing.

2.   Post owner Jeff Bezos controls Amazon (Complaint, ¶ 13-17).

    a.   Bezos enjoys editorial control over the *Post* (Complaint, ¶ 17).

    b.   Bezos has paid what laymen would call bribes to Trump to curry favor for business purposes.

    c.   Bezos paid $40 million for rights to the movie *Melania* (Complaint, ¶ 20) and another $35 million for "promotion" for what was never a financially viable project.[18]

    d.   The *Washington Post* news coverage has been altered (Complaint, ¶¶ 24-29).

    e.   Self-censorship of Post news coverage is part of a broader pattern across the information space (Complaint, ¶¶ 34-62).

C.   Other actions by Trump occurring after filing provide alternate paths to standing.

    a.   E.g., Plaintiff owns an equity interest in Nvidia.

    b.   If the Court found that additional allegations are required, amendment would cure any perceived standing deficiency.

    It is axiomatic that if a citizen enjoys a right, he must "of necessity have a means to vindicate and maintain it, and a remedy if he is injured in the exercise or enjoyment of it; and indeed, it is a vain thing to imagine a right without a remedy, for want of right and want of remedy are reciprocal." *Ashby v. White* [1703] 92 Eng. Rep. 126, 136 (H.C.). And to "take away all remedy for the enforcement of a right is to take away the right itself." *Poindexter v. Greenhow*, 114 U.S. 270, 303 (1884). Under our system, judges are not Platonic Guardians, empowered to decide which rights we can enforce and when. A doctrine that renders constitutional violations immune from judicial

---

[18] Kevin E G Perry, Screenings of Melania documentary cancelled as brutal box office takings continue, *The Independent* (U.K.), Jan. 30, 2026 (promotion costs); Glory Moralidad, Melania Trump's 'Melania' Documentary Fails To Sell a Single Ticket on Opening Night in Boston, *Int'l Business Times* (U.K.), Jan. 29, 2026.

review is incompatible with Article III and cannot be sustained.  Therefore, modern standing doc-

trine is unconstitutional, and cannot be rationally defended.

## CONCLUSION

For these reasons, the Court significantly misapprehended the case.  For that reason, Plaintiff

asks that this Court reconsider its Order pursuant to Fed. R. Civ. P. 59(e).

Submitted this 30th day of January, 2026,



K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing MOTION FOR RECONSIDERATION
PURSUANT TO RULE 59(E) (INCORPORATING AUTHORITY) via e-mail at the following
address:

Bisola Oni, Asst. U.S. Attorney
601 D Street, N.W.
Washington, DC 20530
bisola.oni@usdoj.gov

Dated: Jan. 30, 2026                                              /s/ K.L. Smith

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Case No. 25-cv-01042 (CJN)

K.L. SMITH,

        Plaintiff,

v.

PETE R. FLORES, et al.,

        Defendants.

---

## EXHIBIT A
### EXCERPTED CONVERSATION USED FOR RULE 11 DILIGENCE

This Exhibit is submitted solely to demonstrate Plaintiff's due diligence under Fed. R. Civ. P. 11 and to illustrate a historical inquiry relevant to the issues presented. It is **not offered as evidence**, **not cited as legal authority**, and **not relied upon for the truth of any factual assertions**.

In preparing this brief, Plaintiff used a large language model ("LLM") as a mechanical cross-check to test whether a core historical proposition—namely, that modern standing doctrine is a twentieth-century judicial accretion distinct from the Founding-era "case or controversy" limitation—was facially coherent when assessed against standard historical sources.

The LLM was provided, in substance, the same pleadings, authorities, and framing supplied to the Court, including discussion of *Hayburn's Case*, *Osborn v. Bank of the United States*, *Muskrat v. United States*, *Luther v. Borden*, *Baker v. Carr*, and the historical scholarship of Berger, Jaffe, and Pushaw. Plaintiff then posed targeted questions concerning whether early Article III practice supports modern injury-in-fact standing doctrine, or instead reflects a narrower prohibition on advisory opinions and non-remediable adjudication.

The excerpted portions reproduced here are limited to passages in which the LLM acknowledged that:

1. Modern standing doctrine, particularly the injury-in-fact, causation, and redressability framework, largely crystallized in the twentieth century;
2. *Hayburn's Case* is primarily concerned with separation of powers, finality, and the prohibition on advisory or non-judicial functions, rather than plaintiff-specific injury requirements; and
3. Early Article III practice focused on whether a court could furnish a judicial remedy in a properly framed dispute, rather than on individualized harm as a jurisdictional prerequisite.

1

The Exhibit is offered only to show that Plaintiff's historical framing is not facially irrational or frivolous, and to illustrate the analytical hinge on which the dispute turns. The legal conclusions drawn in the accompanying brief rest exclusively on constitutional text, historical sources, and binding or persuasive legal authority.

Conversation excerpted for brevity.

> *Q: Courts invented standing in the 1920s. If nationwide injunctions are an improper accretion of judge-made law, why isn't standing? Berger, Jaffe, and Pushaw establish that you did not need standing in public. interest cases. Wouldn't the CASA logic apply equally to standing?*

**History and Origins of Standing in the U.S. Constitution**
The term "standing" does not appear anywhere in the original U.S. Constitution (ratified in 1788). The doctrine is a judicial interpretation primarily derived from Article III, Section 2, Clause 1, which limits federal judicial power to "Cases" and "Controversies." This language was intended to prevent courts from issuing advisory opinions or deciding abstract questions, ensuring that federal judges resolve actual disputes rather than hypothetical ones. Early cases like *Hayburn's Case* (1792) hinted at limits on judicial power, but the modern standing doctrine—requiring a plaintiff to show (1) a concrete and particularized injury-in-fact, (2) causation traceable to the defendant, and (3) redressability by the court—evolved much later through Supreme Court decisions.

The doctrine is often divided into:
• **Constitutional components** (core Article III requirements, like injury-in-fact).
• **Prudential components** (judge-made rules, like avoiding generalized grievances).

**The "Invention" of Standing in the 1920s**
Yes, the modern form of standing doctrine largely traces to the 1920s, particularly *Frothingham v. Mellon* (1923), where the Supreme Court rejected taxpayer standing to challenge federal spending as a "generalized grievance" shared by all citizens. This marked a shift toward requiring a personalized, concrete injury, limiting access to courts for public-interest challenges. Critics argue this was a judicial innovation to manage docket loads and preserve separation of powers, rather than a strict constitutional mandate. Before the 20th century, standing was looser, especially in public-rights cases, drawing from English common law traditions like prerogative writs (e.g., mandamus, quo warranto), where citizens could sue without direct personal harm.

The doctrine expanded in the mid-20th century (e.g., *Baker v. Carr*, 1962) but tightened in the 1970s–1990s (e.g., *Lujan v. Defenders of Wildlife*, 1992, emphasizing separation of powers). Some scholars and justices view it as "ahistorical" or "judge-made," not rooted in the Framers' intent.

**Comparison to Nationwide Injunctions: Similarities as "Improper Accretions" of Judge-Made Law**

Nationwide (or "universal") injunctions—court orders blocking government policies everywhere, not just for the plaintiffs—have faced similar criticisms as standing doctrine. Both are seen by originalists as 20th-century judicial inventions lacking historical basis in the Constitution or statutes like the Judiciary Act of 1789.

• **Criticisms of Nationwide Injunctions**: They proliferated in the 20th century, often in politically charged cases (e.g., immigration policies). Originalist critics argue they exceed traditional equity powers, which were party-specific in English chancery courts and early U.S. practice. No founding-era precedent exists for enjoining laws universally; relief was limited to the parties (e.g., *Scott v. Donald*, 1897; *Frothingham v. Mellon*, 1923). They disrupt percolation (debate across circuits) and allow forum-shopping.

• **The CASA Logic**: In *Trump v. CASA, Inc.* (2025), the Supreme Court (6-3, opinion by Justice Barrett) held that universal injunctions "likely exceed the equitable authority that Congress has given to federal courts" under the Judiciary Act. Applying an originalist test from *Grupo Mexicano de Desarrollo v. Alliance Bond Fund* (1999), the Court found no "historical pedigree" for such broad relief in 1789 equity practice. Equity was flexible but confined to traditional boundaries—remedies were for parties, not the public at large. The decision partially stayed nationwide injunctions against Trump's executive order on birthright citizenship, limiting relief to the plaintiffs.

This logic parallels criticisms of standing:
• Both doctrines are "accretions" (add-ons) without explicit constitutional text.
• If nationwide injunctions are improper because they're ahistorical and overreach judicial power, the same could apply to modern standing, which critics say inverted historical norms by *requiring* personal injury where none was needed.
• Originalism cuts both ways: CASA's emphasis on "traditional equitable relief" echoes calls to reform standing by reviving founding-era practices allowing broader access.

However, the Court in CASA did not address standing directly—it focused on remedies. Some concurrences (e.g., Justice Thomas) hinted at broader equity limits, but the ruling leaves room for class actions or state standing to achieve similar broad effects.

AI not being human, it occasionally asks incisive questions we wouldn't think of, serving as a sort of reality check and a vehicle for follow-up inquiries:

Q: *Talk to me about this: "Early cases like Hayburn's Case (1792) hinted at limits on judicial power"*
*Judges can't issue advisory opinions -- what this has always meant was that a case or controversy requires that the court sitting in equity or law can furnish a remedy. Nothing more. As long as the complaint met the proper form, Osborn, the court could hear it. The only exception was the collusive suit, discussed in Muskrat.*
*What do you read from Hayburn's Case that presages modern standing law?*

Response:

Hayburn's Case (2 U.S. 409, 1792) is indeed an early touchstone for understanding the limits of federal judicial power under Article III, but it's often overstated or misinterpreted in discussions of modern standing doctrine. I'll break this down based on the case's text (which is unusually brief and unconventional—more a set of circuit court letters appended to a Supreme Court notation than a full opinion), historical context, and scholarly analyses. My reading aligns closely with your framing: the core "hint" at limits was about ensuring that judicial involvement constitutes an actual exercise of "judicial power" capable of providing a final remedy in a properly formed dispute, not an advisory or administrative function. It doesn't directly foreshadow the personalized "injury-in-fact" or causation/redressability prongs of modern standing (as crystallized in cases like Lujan v. Defenders of Wildlife, 1992), which are 20th-century accretions. Instead, it emphasizes separation of powers, finality, and the avoidance of non-judicial roles—concepts that dovetail with the no-advisory-opinions rule but stop short of requiring a plaintiff's individualized stake.

### Background and What Happened in Hayburn's Case

To set the stage: In 1791, Congress passed the Invalid Pensioners Act, which tasked federal circuit courts (where Supreme Court justices "rode circuit" and sat with district judges) with reviewing pension claims from Revolutionary War veterans. Claimants would petition the court with evidence of service and disability; the judges would assess merit and transmit findings to the Secretary of War. Critically, the Secretary could review and override the court's decision, escalating it to Congress if needed. This wasn't a traditional adversarial lawsuit—it was more like an ex parte administrative certification process.

• **The Judges' Refusals**: Three circuit courts (Pennsylvania, New York, and a combined Southern circuit including North Carolina) balked. They issued letters (not formal opinions) explaining why they couldn't proceed under the Act as judges:
In Pennsylvania (Justices Wilson and Blair, with Judge Peters): They argued the duties were "not of a judicial nature" because the decisions were subject to executive/legislative revision, violating separation of powers. A court's judgment must be final and independent; otherwise, it's mere advice, and "neither the legislative nor the executive branches can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner."
In New York (Chief Justice Jay and Justice Cushing, with Judge Duane): Similar grounds—revision by the executive made it non-judicial, as courts can't render opinions that "might be revised and controlled by the legislature, and by an officer in the executive department."
In the Southern Circuit (Justice Iredell and Judge Sitgreaves): Echoed the above, emphasizing that judicial power requires finality to avoid becoming a tool of other branches.
• These letters were sent to President Washington, who forwarded them to Congress. Meanwhile, veteran William Hayburn petitioned the Supreme Court for a writ of mandamus to compel the Pennsylvania circuit court to act. The Court noted the constitutional issues but dismissed the case as moot after Congress amended the law to shift duties to non-judicial commissioners.

4

• **Key Textual Elements**: The "case" itself is just a short per curiam notation in the reports, appending the circuit letters. There's no majority opinion from the full Court, and it doesn't use terms like "standing" or even explicitly "case or controversy." But the appended letters stress that Article III confines courts to "judicial" acts—those involving actual disputes where the court can issue a binding remedy without external veto.

## What It "Hints" at Regarding Limits on Judicial Power

From my reading (drawing on the primary text and analyses like those in the Federal Judicial Center's summary, Maeva Marcus/Robert Teir's article arguing against overinterpretation, and broader scholarship on Article III origins), Hayburn's presages several foundational limits that indirectly feed into modern justiciability doctrines, but it's more about institutional boundaries than plaintiff qualifications:

• **No Advisory Opinions or Non-Final Roles**: This is the strongest "hint." The judges emphasized that judicial power requires finality—a court's decision can't be "revised and controlled" by another branch, or it's just advisory. As the Pennsylvania letter put it: "Such revision and control we deemed radically inconsistent with the independence of that judicial power which is vested in the courts." This directly presages the advisory opinion doctrine (e.g., as formalized in the 1793 correspondence between Washington and the Justices, refusing to opine on neutrality laws). It's about ensuring the judiciary isn't dragged into executive/legislative errands without a real, enforceable outcome—aligning with your point that a "case or controversy" demands the ability to "furnish a remedy."

• **Separation of Powers as a Gatekeeper**: The case underscores that Article III's "judicial Power" is limited to "Cases" and "Controversies" that are inherently judicial (i.e., resolvable via law or equity with adverse parties or interests). The pension process lacked this—it was ex parte, administrative, and non-adversarial. This hints at a need for some form of "controversy," but not necessarily a personalized injury; it's institutional (courts vs. other branches) rather than plaintiff-focused.

• **Proper Form and Justiciability**: As you noted, this resonates with Osborn v. Bank of the United States (1824), where Chief Justice Marshall said a legal question must "assume such a form that the judicial power is capable of acting on it" (e.g., via writs, petitions, or suits in equity/law). Hayburn's implies that if the setup doesn't allow for a judicial remedy (due to revisability), it's not a proper "case." It also previews the anti-collusion rule in United States v. Johnson (1943) or Muskrat v. United States (1911), where feigned or non-adverse suits were dismissed to avoid advisory rulings. But Hayburn's isn't about collusion—it's about statutory overreach forcing courts into non-judicial hats.

## Does It Presage Modern Standing Law?

Not much, in my view—certainly not the full triad of injury-in-fact, causation, and redressability from Lujan or earlier 20th-century cases like Frothingham v. Mellon (1923). Scholars are split:

• **Supportive Views**: Some (e.g., Justice Scalia in Lujan) cite Hayburn's as an early example of Article III requiring "actual controversies" with concrete stakes, linking it to standing's separation-of-powers rationale (preventing courts from overreaching into policy). The Federal Judicial Center notes it's seen as a precursor to standing, though "scholars disagree" on direct origins.

• **Critical Views**: Others argue it's been misinterpreted (e.g., Marcus/Teir: the case was more about the Attorney General needing presidential approval to argue it, not a broad case-or-controversy mandate). Woolhandler/Nelson (in their article defending standing's history) see early "proper party" rules in public/private rights distinctions, but Hayburn's fits better as anti-advisory than proto-standing. Critics like Cass Sunstein or Steven Winter view modern standing as a later "innovation" privatizing public law, with Hayburn's merely ensuring judicial independence, not barring citizen suits without personal harm.

In short: Hayburn's hints at requiring a remediable, non-advisory "controversy" in proper form (your Osborn/Muskrat point), but it doesn't demand the plaintiff's personalized injury that defines modern standing. It's more a guardrail against judicial entanglement in non-judicial tasks than a barrier to public-interest litigants. If anything, it supports broader access where a remedy is possible, as long as it's not collusive or advisory. What do you think—does this square with how you've read it?

*Q: Modern standing doctrine is often justified by the separation of powers. The problem is that the Framers separated the powers in 1789, and there was no warrant for revising it. Hayburn is an application of the separation -- advisory opinions are not cases or controversies. Some state constitutions allow high courts to give advisory opinions (e.g., Colorado's). The size and shape of the Court's bailiwick is defined by Article III, and need not be revisited.*

Response:

Your point captures a core originalist critique of modern standing doctrine: the Framers deliberately crafted separation of powers in Article III (and the broader Constitution) in 1787–1789, and there's no textual or historical warrant for the judiciary to later "revise" that allocation by inventing new jurisdictional barriers like the strict injury-in-fact requirement. Hayburn's Case (1792) exemplifies faithful application of the Framers' design—enforcing the "Cases" and "Controversies" limit to prevent advisory or non-final judicial roles—rather than a seed for the expansive, plaintiff-focused standing rules that emerged in the 20th century.

### Hayburn as Faithful Separation-of-Powers Enforcement

Hayburn's Case illustrates the early judiciary refusing to be conscripted into a non-judicial function: reviewing pension claims where decisions were subject to executive/legislative revision. The circuit judges (including Supreme Court Justices) emphasized that Article III vests "judicial Power" only in acts that are final, independent, and truly judicial—**not** advisory opinions or administrative certifications that other branches could override. As the Pennsylvania circuit letter stated, such revision was "radically inconsistent with the independence of that judicial power which is vested in the courts."

This directly ties to the advisory-opinion prohibition: federal courts can't render opinions without a remediable dispute, because that would blur branches and undermine judicial independence. It's a clean separation-of-powers application—no more, no less. The case doesn't demand a personalized "injury-in-fact" or trace causation/redressability; it requires

6

only that the matter be in proper judicial form (adverse interests or remediable stakes) so the court can "furnish a remedy" without becoming an adjunct to another branch.

Scholars like Maeva Marcus and Robert Teir have noted that Hayburn is often overread as foundational to standing—it's more about institutional independence and finality than plaintiff qualifications. Later cases (e.g., Muskrat v. United States, 1911) built on it to bar collusive or feigned suits (no real adversity), but Hayburn itself aligns with your Osborn point: if the claim assumes a form where judicial power can act (e.g., via writ, mandamus, or equity suit), it's justiciable.

## Contrast with Modern Standing: Revision Without Warrant

Modern standing (especially post-Frothingham v. Mellon in 1923 and Lujan in 1992) adds layers: a concrete, particularized injury traceable to the defendant and redressable by the court. The Court justifies this as preserving separation of powers—preventing judicial overreach into executive/legislative domains by limiting who can sue.

But as you argue, the Framers already separated powers in 1789:
• Article III defines the judicial bailiwick narrowly (to "Cases" and "Controversies" in enumerated categories).
• They drew from English practice, where citizens could invoke prerogative writs (mandamus, quo warranto, prohibition) in public-rights matters without individualized harm—often to enforce public duties or challenge unlawful government action.
• Raoul Berger's scholarship (Standing to Sue in Public Actions, 1969) shows no Convention hint that standing hinged on personal interest; English courts allowed "strangers" to sue for public enforcement.
• Louis Jaffe (Standing to Secure Judicial Review, 1961) and Robert Pushaw (Article III's Case/Controversy Distinction, 1994) describe public actions (qui tam, relator suits) as commonplace in English/American law—citizens acting as "private attorneys general" without personal stake.
• Critiques like Bruce Terris (Ex Nihilo, 2015) call constitutional standing an "invention" with no Framers' intent for injury requirements.

The Framers' separation was structural and textual—judges interpret law (jus dicere), not make it; courts resolve remediable disputes, not give advice or police policy absent proper form. Adding modern standing as a separation safeguard revises that design without constitutional amendment or clear historical mandate. It's judge-made accretion, akin to how some view nationwide injunctions (rejected in Trump v. CASA as ahistorical).

## State Advisory Opinions as Counterpoint

Some state constitutions explicitly allow supreme courts to issue advisory opinions on legal questions (often to the governor or legislature), showing the federal model isn't universal:
• **Colorado** (Colo. Const. art. VI, § 3): The Supreme Court renders advisory opinions on constitutionality or other matters when requested by authorized branches—distinct from the federal prohibition.
• **Massachusetts** (Mass. Const. pt. 2, ch. 3, art. II): Justices provide opinions on solemn occasions, famously used in the Goodridge same-sex marriage case (2003 advisory on civil unions).

7

• **Rhode Island** (R.I. Const. art. X, § 3): Judges give written opinions on law questions requested by the governor or General Assembly.

• Others (e.g., South Dakota recently) follow suit for guidance on executive/legislative powers.

These provisions show advisory roles can coexist with separation of powers when explicitly authorized—reinforcing that the federal Constitution's silence (and Hayburn's enforcement) deliberately excludes them. No need to "revisit" Article III's shape; it's fixed by text and original design.

In essence, your framing holds: Hayburn applies the Framers' separation faithfully (no advisory roles, require remediable controversy). Modern standing's separation rationale, while rhetorically appealing, adds extra-constitutional hurdles that shrink access to courts—contrary to historical public-action traditions. The bailiwick is defined; revisiting it risks the very judicial overreach standing purports to prevent. If the goal is fidelity to 1789, broader citizen enforcement (via quo warranto, etc.) fits better than narrower plaintiff gates.

*Q: Baker v. Carr isn't a standing case. It is an application of the case or controversy limitation -- if the courts cannot supply a remedy, it is a political question. This line of cases began with Luther v. Borden. Do you agree with my assessment?*

Response:

Yes, I largely agree with your assessment—Baker v. Carr (369 U.S. 186, 1962) is fundamentally a political question doctrine case, not a standing case in the modern sense (i.e., the injury-in-fact/causation/redressability framework from Lujan or Frothingham). It applies the Article III "case or controversy" limitation by focusing on whether a dispute is justiciable, meaning whether courts can provide a meaningful remedy using judicially discoverable and manageable standards. If not, it's a nonjusticiable political question committed to another branch. And yes, this line of reasoning traces back to Luther v. Borden (48 U.S. 1, 1849), which set the template for deeming certain issues (like Guarantee Clause challenges) beyond judicial reach due to lack of remedies or standards.

Let me break it down step by step, tying it to our ongoing discussion on Article III limits, Hayburn's Case, and the ahistorical aspects of modern standing.

**1. Baker as an Application of "Case or Controversy," Not Standing**

• The core of Baker was whether malapportioned state legislative districts (diluting urban votes) presented a justiciable claim under the Equal Protection Clause, or if it was a nonjusticiable political question like prior cases (e.g., Colegrove v. Green, 328 U.S. 549, 1946). Justice Brennan's majority opinion explicitly frames it as an Article III inquiry: Does this qualify as a "case" or "controversy"? The Court refined the political question test into six factors (e.g., textual commitment to another branch? Judicially manageable standards? Risk of multifarious pronouncements?).

• Remedy is key, as you noted: If courts lack standards to adjudicate or can't enforce a remedy without invading political domains (e.g., redistricting via judicial fiat), it's nonjusticiable. In Baker, the Court found standards (one-person-one-vote from Equal Protection) and a remedy (ordering reapportionment), making it judicially viable.

8

• Standing gets a brief nod: Brennan assumes plaintiffs have it via vote dilution as a cognizable injury, but it's not the opinion's focus. No deep dive into personalized harm, traceability, or redressability—the hallmarks of modern standing. Scholars like Richard Fallon (The Fragmentation of Standing, 1988) note Baker as part of broader justiciability, but it's pre-Lujan evolution where standing was looser and often conflated with merits or ripeness.

This aligns with the Framers' design (as we've discussed): Article III requires a remediable dispute in proper form (Osborn v. Bank of the United States, 1824), not abstract advice (Hayburn's Case) or political thickets without judicial tools.

## 2. The Lineage from Luther v. Borden

• Absolutely—Luther is the foundational political question case. It arose from Dorr's Rebellion (1841–1842) in Rhode Island, where rival governments claimed legitimacy under the Guarantee Clause (Art. IV, §4: U.S. shall guarantee republican form of government). Chief Justice Taney's opinion held it nonjusticiable: No judicially discoverable standards for what constitutes a "republican form"; resolution committed to political branches (Congress seats members; President recognizes governments via militia calls). Enforcing a remedy would require courts to override political/military decisions, risking chaos.

• This "no remedy, no case" logic directly informs Baker: Brennan cites Luther extensively, distinguishing it (Guarantee Clause lacks standards; Equal Protection provides them). The political question doctrine evolved as a case/controversy gatekeeper—ensuring courts stay in their lane without warrant for revision, as you put it.

• Precedent chain: Luther → Pacific States Telephone & Telegraph Co. v. Oregon (1912, Guarantee Clause nonjusticiable) → Colegrove (apportionment as political) → Baker (refining/overturning Colegrove). It's a consistent application of Article III's fixed boundaries, not an expansion like modern standing.

## 3. Why This Matters in Our Broader Discussion

• Your point reinforces the originalist critique: The Framers separated powers in 1789 via textual limits (Cases/Controversies), and doctrines like political question enforce that without needing 20th-century add-ons. Hayburn/Luther/Baker show early courts applying separation faithfully—advisory opinions or remediless political questions are out because they aren't "judicial" acts.

• Modern standing, by contrast, often bootstraps separation rationale (e.g., Scalia in Lujan: prevents "overjudicialization") but adds plaintiff barriers absent in founding-era public actions (Berger/Jaffe/Pushaw). If Baker/Luther suffice to police boundaries, why revise with injury-in-fact? State advisory provisions (e.g., Colorado) highlight that federal limits are intentional and shouldn't be "revisited" judicially.

One minor quibble for nuance: While Baker isn't "a standing case," it indirectly influenced standing's fragmentation—post-Baker cases like Flast v. Cohen (1968) experimented with taxpayer standing, and the doctrine's manipulability (as we've discussed) sometimes blurs with political questions (e.g., Rucho v. Common Cause, 2019, deeming partisan gerrymandering political due to no standards). But your core assessment holds: It's case/controversy application, not standing invention.

Conversation between Grok and Human, Jan. 29, 2026 (excerpted for brevity)

9